**EQUAL EMPLOYMENT OPPORTUNI-
TY COMMISSION, Plaintiff,**

v.

**SHONEY'S, INC., Defendant.**

**Civ. A. No. CV 81–G–0509–S.**

United States District Court,
N. D. Alabama, S. D.

Jan. 27, 1982.

Motion for Relief from Summary Judgment
Denied March 23, 1982.

Cynthia R. Glover, Senior Trial Atty., E. E. O. C., Birmingham, Ala., for plaintiff.

Charles A. Powell, III and Lewis W. Page, Jr., Lange, Simpson, Robinson & Somerville, Birmingham, Ala., for defendant.

## MEMORANDUM OPINION

GUIN, District Judge.

This cause arose from a charge of employment discrimination filed by Charles A. Firth with the Equal Employment Opportunity Commission on April 1, 1980. In his charge, Mr. Firth claimed that he was terminated as kitchen manager at the Fifth Quarter Restaurant[1] in retaliation for protesting the discharge of a female, Christi Pollock, as head waitress. After the charge was investigated and conciliation failed, the EEOC instituted this action pursuant to 42 U.S.C. §§ 2000e *et seq.* The case is presently before the court on motion by the defendant, Shoney's, Inc. (Shoney's), for summary judgment.

After considering the submissions and arguments of counsel, the depositions of the charging party and of other witnesses, and applicable law, the court concludes that this is an appropriate case for summary judgment. Although the court is generally reluctant to grant summary judgment in a Title VII case, the court is convinced that such is appropriate in this particular case. Support for granting a summary judgment in such a case is found in *Rosser v. Laborers' International Union of North America, Local Number 438*, 616 F.2d 221 (5th Cir. 1980), in which the Fifth Circuit affirmed the grant of summary judgment in favor of a Title VII defendant.

The evidence before the court does not take the posture of the much maligned battle of affidavits; instead, the evidence is comprised of the sworn and cross-examined deposition testimony of the charging party and others, as well as answers to interrogatories. The record is very complete indeed and it is virtually incomprehensible that much more additional evidence would be presented to the court at trial. Based thus upon an extensive and virtually complete record, the court concludes that there exists no genuine issue of material fact, and that the defendant is entitled to judgment as a matter of law for the reasons stated herein.

■ The thrust of the EEOC's claim is that Charles Firth was terminated in retaliation for complaining that his girlfriend's termination was the result of sex discrimination. The evidence before the court, however, demonstrates that the EEOC cannot meet the first element of a prima facie case for retaliation. As stated by the EEOC in its brief to the court, to establish a prima facie case of retaliation under § 704(a), 42 U.S.C. § 2000e–3(a), a plaintiff must (1) establish statutorily protected expressions, (2) an adverse employment action, and (3) a causal link between the protected expression and the adverse action.

1. The Fifth Quarter is the name of one of the restaurants owned and operated by Shoney's, Inc.

*Smalley v. Eatonville*, 640 F.2d 765, 769 (5th Cir. 1981); *Whatley v. Metropolitan Atlanta Rapid Transit Authority*, 632 F.2d 1325 (5th Cir. 1980). The EEOC asserts that Firth protested an employment practice which he reasonably believed to be illegal. The evidence, however, is to the contrary.

The uncontradicted evidence, supplied primarily through the deposition of Charles Firth himself, shows that Firth never complained or suggested to anyone with Shoney's that the Pollock discharge was illegal, unlawful, or in violation of Title VII. His expressions consisted of complaints that his girlfriend had been fired while other managers' girlfriends had not. His own testimony regarding the complaints he made do not support even an inference that he protested Pollock's discharge as any form of an unlawful employment practice. His very generalized complaints were that he was not being treated fairly in that other managers could date waitresses who worked at the restaurant. There is nothing in his own testimony of what he said that would put Shoney's on notice that he was protesting an illegal employment practice.[2]

The testimony of Jim Walker, first assistant manager at the Fifth Quarter and longtime close friend of Charles Firth, and the testimony of Mr. Rooker, manager of the Fifth Quarter at the time in question, further support the conclusion that Firth never intimated that Pollock's discharge was illegal or discriminatory; instead, his repeated complaint, as related by these men, was that he was not treated fairly in that he could not date a waitress employed by the restaurant.[3]

The EEOC tried to show that Firth did make statutorily protected expressions by quoting from two entirely separate sections of Firth's deposition. The EEOC set out in brief a quotation wherein Firth stated his complaint that preferential treatment was given him because of his management status. In an attempt to link Firth's complaint about the managerial preference to sex discrimination, the EEOC then leaps to page 72 of the deposition where Firth was asked by an EEOC attorney what he meant and felt when he signed the EEOC charge. There is no evidence whatsoever that Firth's "feelings" about the consideration of sex in the Pollock discharge were ever communicated to Shoney's, or that such feelings were even held by him prior to signing the charge. What he may have "felt" or "meant" when he signed the EEOC charge after consultation with EEOC personnel sheds no light on the nature of his verbal complaints to Shoney's.[4]

The evidence before the court convincingly demonstrates that Mr. Firth's complaints which he made known to Shoney's did not rise to the level of expressions protected by § 704(a); that is, he did not verbalize any opposition to an unlawful employment practice. Further, Title VII does not prohibit preferential treatment of management personnel over employees, which was the clearest complaint ever voiced by Firth to anyone at the Fifth Quarter. The only inference supportable by all the evidence before the court is that Firth did not engage in any statutorily protected expressions and, therefore, the EEOC has failed to

2. The pertinent portions of Firth's deposition are contained in Addendum A to this opinion.

3. The pertinent portions of Mr. Walker's deposition are set out in Addendum B to this opinion, and the pertinent portions of Mr. Rooker's deposition are in Addendum C.

4. It is interesting to note that on the initial intake questionnaire Firth said he was discharged while voicing disagreement over current unfair practices at Fifth Quarter. He does not specify the nature of those unfair practices. In the space which reads: "Do you believe this action was taken against you because of: (Check the one(s) that apply and specify your race, sex, religion or ethnic identity.)...," Mr. Firth marked "other" and gave as his explanation "Association with President of Shoney's and terminated employee." Mr. Firth admitted in his deposition that he thought his association with Mr. Wachtel of Shoney's was one of the reasons for his termination. (Deposition of Firth at 46–47.) The charge itself, however, makes no reference to the association with the president. In explanation, Firth said that the EEOC counselor who took the charge deleted that reference although Firth continued to assert that it was pertinent to the reason he was discharged. (Deposition of Firth at 53–54.)

establish a prima facie case of retaliatory discharge in violation of § 704(a). Summary judgment is thus due to be granted in favor of Shoney's.

Shoney's entitlement to summary judgment also finds support in an alternative ground. Assuming that the inference could be drawn that Firth did complain of discriminatory treatment of Pollock because of her sex, and that the EEOC could establish a prima facie case, the defendant has a valid defense which supports its termination of Firth and which has not been shown to be a pretext.

■ As the Fifth Circuit has made clear, not all activity in opposition to unlawful employment practices is protected under § 704(a). *Rosser v. Laborers' International Union of North America, Local Number 438,* 616 F.2d 221, 223 (5th Cir. 1980), *cert. denied,* 449 U.S. 886, 101 S.Ct. 241, 66 L.Ed.2d 112 (1980); *Jefferies v. Harris County Community Action Association,* 615 F.2d 1025, 1036 (5th Cir. 1980); *see also, McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Hochstadt v. Worcester Foundation for Experimental Biology,* 545 F.2d 222, 230–34 (1st Cir. 1976); *Garrett v. Mobil Oil Corp.,* 531 F.2d 892, 895–96 (8th Cir. 1976), *cert. denied,* 429 U.S. 848, 97 S.Ct. 135, 50 L.Ed.2d 121 (1976). The courts have held instead that the employee's conduct must be reasonable in light of the circumstances. Further, the employee's right to express his grievance must be balanced against the employer's right to operate his business. *Jefferies,* 615 F.2d at 1036, *quoting Hochstadt v. Worcester Foundation for Experimental Biology,* 545 F.2d at 233.

As the Fifth Circuit stated in *Rosser,*

Even though opposition to an unlawful employment practice is protected, such protection is not absolute. There may arise instances where the employee's conduct in protest of an unlawful employment practice so interferes with the performance of his job that it renders him ineffective in the position for which he was employed. In such a case, his conduct, or form of opposition, is not covered by § 704(a). *See Hochstadt v. Worcester Foundation for Experimental Biology,* 545 F.2d 222, 230–33 & n. 6 (1st Cir. 1976); *Doe v. AFL–CIO, Department of Organization, Region 6, Atlanta, Georgia,* 405 F.Supp. 389, 392–94 (N.D.Ga.1975), *aff'd,* 537 F.2d 1141 (5th Cir. 1976). We believe that on balance, this is just such an instance.

616 F.2d at 223.

In *Rosser,* the plaintiff had opposed union policies by active political opposition to her supervisor's candidacy for reelection as secretary-treasurer. The court found that, by so doing, Mrs. Rosser placed her loyalty and cooperation with her supervisor in question, thus diminishing her effectiveness as dues posting clerk. The court concluded that this gave her employer (the union) a valid nondiscriminatory reason for discharging her. 616 F.2d at 224.

■ In the case before this court, the uncontradicted evidence shows that Firth's conduct was not reasonable, he interfered with the operation of the restaurant, and his conduct severely lessened his effectiveness as kitchen manager. Between the time Pollock was discharged on Wednesday afternoon, March 19, 1980, and the termination of his employment the following Friday afternoon, March 21, Firth testified that he complained to the three other managers "probably 10 to 15 different times." (Deposition of Firth, at 31.) Jim Walker, Firth's close friend for four years, testified that following the time Pollock was terminated, "Charlie Firth was a completely irrational human being. He was constantly dogging every manager's heels saying I don't understand. I don't understand. Why could they do this to me. How could they do this to her. What's going on. And by the end of the week, he had actually worked himself into a frenzy." (Deposition of Walker, at 28.) When asked whether Firth was running the kitchen during this time, Mr. Walker replied, "No. He spent most of his time pursuing myself and Larry Rooker just over and over asking us the question; why was she terminated?"' (Deposition of Walker, at 33.) As a matter of fact, Mr. Walker further stated that he and

another person had to do a considerable amount of work in the kitchen for which Firth should have been responsible. (Deposition of Walker, at 36.)

The uncontradicted evidence shows that Firth did not do his job Wednesday, Thursday and Friday before his termination.[5] There is further uncontradicted evidence that Firth's constant complaining interfered with the work of other employees. Conduct which interferes with the operation of an employer's business or which prevents the employee from doing his job is not "opposition" activity protected by § 704(a) and may justify the termination of that employee. *See Rosser*, 616 F.2d at 223–24; *Jefferies*, 615 F.2d at 1036–37. From all the evidence before it, the court holds that Shoney's had a valid nondiscriminatory justification for terminating Firth, even assuming his continuous complaints were that Pollock's termination was an unlawful employment practice.[6] Shoney's thus has a valid defense which has not been shown to be a pretext and which would defeat a prima facie case, assuming that the EEOC could establish one.

Shoney's asserts that it is entitled to summary judgment for still another reason. In its answers to interrogatories, the EEOC

stated that Firth was terminated in retaliation for protesting that Christi Pollock was discharged for dating him and he was not discharged.[7] Shoney's asserts that the EEOC's position is absurd because it in effect contends that if a person complains that he should be fired, then it is illegal to fire him. The court recognizes the right of the EEOC to phrase its contentions as it desires. The EEOC's assertion, however, does strike the court as farfetched. Further, such a contention is not supported by the evidence since the uncontradicted testimony of every witness is that Charles Firth never suggested that he should be discharged. As a third alternative ground, this position asserted by Shoney's is sufficient to support a summary judgment.

For the reasons stated herein, the court concludes that there exists no genuine issue of material fact and that Shoney's is entitled to judgment as a matter of law. Summary judgment therefore is due to be granted Shoney's. A separate order will be entered contemporaneously herewith.

### ADDENDUM A

*Deposition of Charles Firth*

(pages 31–35)

Q Did you voice that displeasure?

5. There is some dispute as to whether Firth neglected to report the preceding Monday morning to do kitchen inventory, and as to whether Firth voluntarily tendered his restaurant keys in resignation or was told to do so. The court finds these disputed facts to be immaterial to its conclusion that Shoney's was justified in terminating Firth.

6. The court reiterates its conclusion that such an inference cannot rationally be drawn from Firth's own testimony. The EEOC must be bound by the sworn testimony of its charging party.

7. The question propounded to EEOC reads:
8(a). Shoney's Inc. has stated in answers to interrogatories as follows:
Charles Firth's employment terminated because of poor job performance, including tardiness, and his ability to function effectively with his co-managers and his supervisors in the performance of his management responsibilities.
Do you contend that Charles Firth's termination of employment was because of any reason other than as stated above? If so, state

in complete and specific detail your contention as to the reason that Charles Firth's employment terminated.
8(b). As to any reason stated above, state in complete and specific detail the factual basis for your contention together with the name of any person known to you who has personal or discoverable knowledge concerning such facts or contention.
To which, the EEOC responded:
8(a). Yes. Plaintiff contends that Charles Firth was terminated in retaliation for protesting the discharge of Christi Pollock based on her sex, as violation of the law. The Company has an unwritten policy prohibiting management and hourly employees from dating each other. Christi and Charles were dating each other, however Christi was discharged and Charles was not discharged.
8(b). Base [sic] on the contention of Charles Firth he was terminated after a confrontation with Gene Simon. During the confrontation he vigorously protested the fact that Christi Pollock was discharged for dating him and he was not discharged.

A   Yes, sir.

Q   On one occasion, or more than one occasion?

A   On many occasions.  From that day, until Mr. Simon terminated me for disagreeing with him that Friday afternoon.

Q   Do you have any judgment as to how many times you complained about Christi's having been fired between Wednesday afternoon and Friday afternoon, when you left?

A   Probably 10 to 15 different times.

Q   To whom did you make your complaints?

A   Complaints to Mr. Walker, Mr. Rooker, Mr. Simon, some general conversation with other employees as far as, "Where is Christi?  What happened to Christi"?  That type of thing.

Q   Do you recall what you said in any of those conversations, with Simon, Walker, or Rooker?

A   The main content of most of them was my—I was fairly confused as to why Mr. Rooker and Mr. Simon and Mr. Erwin, another manager, could date female employees that were working there, and they still retain their jobs, and Miss Pollock being terminated.  Just my being baffled at that was the main content of all conversations.

Q   What explanations, if any, were given to you as to what had been done?

A   Again, Mr. Walker stating Larry just didn't like Christi.  Nothing to do with her work performance.  It was, evidently, a personal dislike between those two, was usually the main answer.

Q   Charlie, have you given anyone any statements that you have signed in connection with the charge you filed with the EEOC, or in connection with this litigation?

A   I believe this—well, I've got everything here.  Let's see.  My charges I signed.  Would be all—EEOC response would be the only things I would have signed, other than signing, I believe, for the subpoena that was issued.  But, as far as any conversation or signing any affidavits, other than EEOC, no.

Q   You say, "other than EEOC," did you sign an affidavit with the EEOC?

A   My charges.

Q   The charge is the only thing you signed?

A   It's the only thing I have a copy of.  There might have been, perhaps, a release or something that I don't have a copy of.  I can't remember if I signed anything during the fact-finding conference as far as minutes or anything like that.  I believe I have—this copy is probably the only affidavit.

Q   What you're showing me is a copy of the charge itself that you filed?

A   Right, sir.

MR. POWELL:  We'll get a copy made of that.  But, I'll ask that that be marked as Exhibit A to this deposition.

(Defendant's Exhibit A marked to the testimony of Mr. Firth and accompanies the original of this transcript filed with the Clerk of the Court.)

A   And, signing for, evidently, certified mail.  So, I would have signed that release with the post office as far as—

Q   Charlie, if you would, look at what we have marked as Exhibit A, which is the charge that you filed with the EEOC.  If you will refer to the last paragraph on Arabic 3, you refer in there to, "Sandy Willingham, waitress."  I take it Sandy Willingham was a female?

A   Right, sir.

Q   And, "Nikki Childress, waitress."  I take it, was a female?

A   Right, sir.

Q   And Larry Rooker and Carl Erwin, I believe you have already identified for us.  They were male managers?

A   Right, sir.

Q   Is what appears on this statement an accurate statement of the protests that you had been making Wednesday afternoon, and Thursday and Friday to the various management, other managers there at the restaurant?

A Right, sir. This would include pretty well the topic of most conversations.

Q Tell me how you came about terminating your employment on Friday: Who was present, what time was it, where did everything take place.

A Approximately 5:00 p. m. in the afternoon, was standing out on the loading dock at the rear entrance to the restaurant. And in discussion between myself and Gene Simon, I was, again, protesting, "Why can you, Mr. Rooker, Mr. Erwin, have relationships—" especially Mr. Simon. The relationship he was involved in at that time with a female manager who had been advanced quite rapidly. Basically, "How come you can do it, and we can't"? Was my argument. And with that, I received a reply, "You just quit. With that attitude, you just quit." And, I never, "quit." That was Mr. Simon's statement, more or less, "You're fired," by telling me I had, "just quit."

Q At the time he said, "You just quit," where were your keys, Charles?

A On my person. Either strapped to my belt, or in my pocket.

Q Or, down on the ground, or on top of a car, or anywhere else. Or, do you recall?

A Not—I can't say for sure, no, sir. I believe they were attached to my person.

Q Normally they were?

A Right, sir.

Q But you don't know where they were at the time Gene Simon made the comment, "You just quit."

A No, sir.

Q That was a rather heated conversation, wasn't it?

A Yes, sir. Quite.

Q And it had started inside; hadn't it?

A Yes, sir, I believe it had, in the rear dish area of the kitchen.

(pages 41–42)

Q We are still, at this time, talking about Sandy Willingham, and Nikki Childress, who were some way involved with other managers?

A And with that conversation, primarily, Mr. Simon and Jan Ott.

Q Where was Mr. Simon located, in terms of his office?

A His permanent office, I believe, is in Nashville. He used, I guess, our office as far as communication between our store and Nashville. I don't believe he had an office in Birmingham. There was a regional office for Mr. Stratton that he might have used some. But, basically, he was just in the store looking around. He wasn't doing any working functions while he was there.

Q He had several other restaurants that were under his supervision?

A Right, sir.

Q Where was Miss Ott located?

A She was my Assistant Kitchen Manager. There was a central office for the managers, paper work and that type of thing, where any paper work she might have had to do, any productivity, would have been done in the kitchen area itself. At that time, when she was Assistant Kitchen Manager. She had worked in, pretty well, every department in the restaurant. Service hostess.

Q At the time you are referring to now, she was part of management?

A Right, sir.

Q As was Mr. Simon?

A Right.

Q What was his reply when you said, "How come you can date her"?

A It was, "Charlie, you just quit."

Q I take it you're compressing the 20-minute conversation—

A Right.

Q —into two sentences. Tell me about the bickering that went on back and forth for the remaining 19 minutes.

A He would never nail himself down. "That's irrelevant." I would say—for instance, I would give examples of Miss Ott's advancement, you know, a clear, blatant case of their relationship that continued.

And just more or less, "Why can't my relationship continue, and yours can"?

(pages 52–56)

... decision to go ahead and stay full-time work, and would work full time for them.

Q So, I take it, then, that you haven't told them that you are just there, supposedly, on a temporary basis?

A My intentions are full time, until any other decisions might be made as far as the charges go.

MR. POWELL: Mark this as Exhibit B. (Defendant's Exhibit B marked to the testimony of Mr. Firth and accompanies the original of this transcript filed with the Clerk of the Court.)

Q Charlie, I am going to show you what we have had marked as Defendant's Exhibit B, and ask you if that document is in your handwriting?

A Yes, sir. The handwriting is mine.

Q That is called Intake—what is the name?

A Questionnaire.

Q Intake Questionnaire. And, is that the Intake Questionnaire that you filled out on April 1st, 1980, at the EEOC, when you went to file your charge?

A Yes, sir.

Q Did I understand from your earlier testimony that the unfair practices that you refer to in the Intake Questionnaire, and in your charge, are those that you told us about relating to Sandy Willingham and Nikki Childress?

A Right, sir.

Q I notice your charge itself omits any reference to your association with the President of Shoney's. Did you inquire of—

A Yes. Miss—I can't remember the lady's name. Vandergraff, or something like that, took the charge. A lot more information was discussed between myself and her. She seemed to think that this was the primary information needed. She deleted any other statements we made that day as far as being pertinent, at that minute, to the particular charges that had been filed, were being filed.

Q You, however, had thought that it was pertinent that you were discharged, at least in part, because of your association with Mr. Wachtel, the President of Shoney's?

A Right, sir.

Q But, the EEOC didn't think that was important?

A Well, the particular lady I talked to, she was a representative of the EEOC, she didn't think it was pertinent enough at the time. And, accepting her advice as a professional in this field, I agreed with her.

Q Did you discuss with this EEOC representative, Mr. Simon's relationship with Miss Ott?

A Yes, sir, I did. And there again, she didn't think that was pertinent to the charges at that time.

Q Did she explain why it was not?

A She said we had listed enough instances, as far as any violation. The people we had mentioned here were enough, in her opinion, as far as in filing a charge. I was pretty persistent in wanting that to be included, but, she seemed to think that what we had was enough information here.

Q Did you give her any instances other than Sandy Willingham, Nikki Childress, and the Ott girl?

A No, sir.

Q The fact of the matter is, Mr. Simon was married at the time he was dating Miss Ott; wasn't he?

A I believe so, yes, sir.

Q It was fairly widely known; wasn't it?

A Yes, sir.

Q That was part of y'all's conversation; wasn't it?

A Yes, sir.

Q He was on the edge of getting a divorce at that time; wasn't he?

A I believe so.

Q He actually did get a divorce; didn't he, Charlie?

A  I'm not sure what happened. I think I've heard that, hearsay. I'm not for sure. I know he's left Shoney's. Is the only really definite—I have as far as his actions since that conversation.

Q  In fact, part of your conversation with him evolved around his taking an exception to your doing so much mouthing about his and Miss Ott's relationship; didn't it?

A  Could you repeat the question. I didn't—

Q  Part of your 20-minute conversation with Mr. Simon on the afternoon that you either quit or got fired, related to his taking exception to you doing a lot of talking about his and Miss Ott's relationship; didn't it?

A  Right, sir.

Q  He didn't feel it was in his best interest to have anybody running around doing a whole lot of talking when he was still married; did he?

A  He didn't come out and say it. Perhaps that's the way he perceived it.

Q  That was rather implicit in the conversation; wasn't it?

A  Well, as far as my discussions with him, primarily, were his and Miss Ott's relationship. And, his position as a superior, versus his action in a pretty blatant manner with other employees, being a stable, married restaurant supervisor professional.

Q  In boiling it down to a nutshell, wasn't your main complaint to Mr. Simon on Friday that your girl friend had been fired, and his hadn't, and Rooker's hadn't, and the other manager's hadn't?

A  Right, sir. That was—

MR. POWELL: I think that's all I have.

EXAMINATION BY MR. WILLIAMS:

Q  Let me ask you a few questions: You were discharged, your employment was terminated, on March 21st, 1980; is that correct?

A  Right, sir.

Q  Okay. What is the date—how long were you unemployed from March 21st?

A  Approximately nine weeks.

Q  Nine weeks. Okay. Did you have any employment . . .

## ADDENDUM B

### *Deposition of Jim Walker*

#### (pages 22–38)

A.  That is. Second page? Um-hmm.

Q.  Are these statements true to the best of your knowledge?

A.  They are correct.

Q.  Prior to Charles Firth's discharge or after his discharge, did he ever—

MR. POWELL: We're going to object to counsel's continued utilization of the word "discharged."

The witness is the one—has yet to characterize anything in this case as a discharge other than Miss Pollock's termination.

Q.  Prior to Charles Firth's termination at Shoney's or Fifth Quarter, did he ever—not prior to, I'm sorry. Subsequent to Charles Firth's discharge, let me clarify that, termination at Fifth Quarter, did he talk to you about how he felt regarding Christi Pollock's discharge?

A.  Yes.

Q.  What did he say?

A.  He said, it was unfair.

Q.  Is that all that he said?

A.  As far as I can remember, it basically came down to the fact that he just thought it was unfair.

Q.  Did he say it was unfair for any particular reason?

A.  That is hard to say. He rambled on for so much for so many days that to me it basically boiled down to he just thought it was unfair.

Q.  This was after he was terminated—

A.  No, ma'am.

Q.  —after his termination?

A.  Prior.

Q.  Prior to his termination?

A.  Yes.

Q. Is that directly after Christi was discharged?

A. Yes, for that whole week.

Q. Do you recall the time period between Christi's discharge and Charles Firth's termination?

A. It was—Christi was discharged on Wednesday and Charlie's employment at the Fifth Quarter was terminated, I believe, that following Saturday.

THE WITNESS: I don't—Is that correct? I don't think another week went by. I can't remember.

MR. POWELL: It was Friday or Saturday.

A. It was Friday or Saturday. It was not a very good week.

Q. Did Charles ever make a statement that he thought it was unfair for Christi to be discharged and him not to be discharged?

A. No.

Q. Do you know if Charles spoke to any other managers about his discharge other than you?

A. I'm sure he spoke to all of us. I know he spoke to Larry Rooker.

Q. Was this before?

A. During the week.

Q. During the week?

A. Yes. As far as the other assistant managers, I don't know. But, judging from his behavior, I would assume that he spoke to every manager.

Q. What do you know about any circumstances—any circumstances surrounding Charles Firth's termination of employment?

A. Can you be more specific?

Q. Do you know—Have you heard of any reasons why Charles Firth was terminated—employment was terminated?

A. I don't actually know how the actual termination took place. It took place outside with Gene Simons and Charlie Firth.

Q. Do you know of any of the circumstances or any—

A. Revolving around that?

Q. Yes.

A. Do you mind if I give you my whole story on that?

Q. Whatever you know about it.

MR. POWELL: Tell it all, Brother.

A. From the date that—Let me put it this way. Charlie Firth was rehired at the Fifth Quarter Friday prior to the Monday they were late. The dates I can't give you. That Friday, he was rehired in a very large management meeting with the president of Shoney's, Dave Wachtel, Gene Simons, Larry Rooker, myself, Doug Herrick, Carl Erwin, and maybe the assistant kitchen manager, Lee Godby.

At that time he was rehired. We adjourned to the lounge and had a couple drinks where we discussed the fact that we were happy to have him back.

He had promised me at that point, in front of all those other people, that he would meet me in the kitchen at 5:30 Monday morning to complete inventory. Which—What I was doing at that time, I was transferring my inventory back to him to become his inventory and to avoid any mathematical failure or human error. I wanted him to be present and accept full responsibility when I was cleared of the inventory, which is a very serious offense when you mess up inventory.

He agreed to meet me in front of these other people. That morning, Monday morning, I arrived at 5:30. I waited until 6:30. He didn't show. He had no phone where he was living. I began inventory myself. I completed inventory at approximately at 8:30, phoned my figures into Nashville.

I waited until 9:30 when my kitchen was open. I told Larry Rooker that I couldn't wait any longer. I was going to Charlie Firth's house and find him. On the way to his house, I passed him at close to 10:00 o'clock. I proceeded on to the apartment and banged on the door to wake Christi up, find out what was wrong with him. She didn't wake up. And I mean banged.

I left there—

Q. Was she there?

A. As I found out later, yes, she was there. She didn't wake up. I came back later—See that's the funny thing about me. Because I did bang on the door to try to wake her up.

I went back to the Fifth Quarter and he was there. And I proceeded to give him a very bad verbal tongue lashing. And the thing you have to understand is our tongue lashings go beyond manager to manager because he was a personal friend of mine for four years. And, you know, it's easier to cuss a friend than it is someone you don't know when you feel like they've failed you.

And I went out on a limb to pull him back to Shoney's. I went out on a personal limb. I put my job on the line and—

Q. Okay.

MR. POWELL: No. Let him finish his story.

Q. I just want to know is this the day he was discharged?

A. No. This is Monday. This is the day that he and Christi Pollock—he showed up late. Christi Pollock did not show up.

Q. Okay. Proceed.

A. After lunch at that time was over with, we sat down and talked to Charlie. We said, you know, we just don't understand what is going on. He said, I just—I don't know. I messed up. I messed up.

Well, Larry said, Charlie, this is it for Christi. This is her second time. We have to discharge her. And he said that he understood that. He perfectly understood.

She was not scheduled for the next shift on Tuesday. During that time span, apparently, she talked to Larry Rooker. I don't know. But, she came in on Wednesday for a meeting in the afternoon and at that time she was offered a job at the Sailmaker. She was not offered termination. She was offered a relocation to a job completely alike in money and in food and in working habits to what she had at that time.

She didn't want the job. So, she was terminated, discharged, whatever term you want to use. From that point on during the entire rest of the week, Charlie Firth was a completely irrational human being. He was constantly dogging every manager's heals saying I don't understand. I don't understand. Why could they do this to me. How could they do this to her. What's going on. And by the end of the week, he had actually worked himself into a frenzy.

And on the date that he was terminated, he confronted Gene Simons in the office and what became a confrontation slowly evolved into a shouting match, into a cussing match, and very near became fisticuffs when myself and Larry Rooker, being the managers, asked them both to leave the restaurant. If you guys want to talk, go out back because we have employees that are listening to you. And this is not good for the employees.

They went out back and I don't know what they discussed. I walked out the back door to see if they were still standing up and I heard Gene Simons say, "Well, Charlie, you've already quit, because you just gave me your keys."

Now, I'm sure that's the key words. I heard Mr. Simon say holding the keys, "But, Charlie, you have just—you have already quit, because you just gave me your keys." Now, I don't know if you're familiar with the significance of giving the keys. Like in James Taylor, "pack up and mail in my keys," you know. That is significant of quitting in a restaurant is giving back your keys. Which is what he did two months prior in setting his keys on the broiler and hitting the door and saying, "I quit." To that extent, what I heard outside that back door is all I know about what actually took place between the two of them.

Q. Okay. So, you're saying the only thing you actually heard was Gene Simon saying, "Charlie—

A. "But, Charlie, you already quit, because you gave me your keys." And that's—as far as the two—what happened there, that's it.

THE WITNESS: Can we break for a bathroom break?

MS. GLOVER: Sure.

(WHEREUPON, there was a five-minute break.)

Q. Okay. You stated that you heard Gene Simon say to Charlie—Charles, "You've just quit"?

A. "You've already quit."

Q. "You've already quit."

Did Charles respond to this statement?

A. Yeah. He got in his car and drove off. After—I can't remember the exact wordage, but there were a few abusive comments slung either way.

Q. What did Charles say?

A. Goddamn, sonofabitch, ass hole, motherfucker. I can't remember the exact wordage. It was just a back and forth confrontation, you know.

And Gene, the whole time, saying, "Okay. Fine. Anything you want to call me. Fine." You know. "Go ahead." You're talking about somebody that's angry and very upset and very irrational.

MS. GLOVER: Okay. I have no further questions.

EXAMINATION

BY MR. POWELL:

Q. Jimmy, during the Wednesday evening—What time did—was Christi in fact terminated on Wednesday, do you recall?

A. Lunch ends at 2:00 o'clock and dinner begins at 5:00 and it happened between that period. I would estimate between 2:30 and 4:30, approximately. Because I know it would be before the dinner hour.

Q. Were you present during all the meeting with Larry Rooker?

A. No.

Q. Were you there for any of that meeting?

A. I walked up to the table to deliver a message about a phone call for Larry Rooker, but I declined to be at that meeting.

Q. You testified earlier that you were the chief enforcer.

Would you normally have been the one to handle the firing?

A. Yes, sir.

Q. Why did you not participate in that meeting?

A. Due to my friendships with both of them.

Q. Okay. From that—

A. And I think another reason, too, Larry had called her and requested a meeting with her and more or less gone over being his—

Q. His baby?

A. I declined to Charlie. When he asked me, I said I cannot.

Q. Charlie asked you to do it?

A. Yes.

Q. Okay. Between that event mid-afternoon on Wednesday and the time of the Simon confrontation on Friday, what time did the Simon confrontation begin to the best of your recollection?

A. It was before the dinner hour. Anything that happened was before 5:00 and from 2:00 to 5:00. So, it could have started as early as 2:30 or 3:00 and ended before 4:30.

Q. Do you recall if Charles was in fact late on that Friday or not, did you have any recollection of that?

A. No.

Q. Was Simon in fact in the restaurant that day because of problems with Charlie?

A. I can't recall that either, possibly, but I don't remember.

Q. How long did the Simon confrontation go on, beginning to end?

A. I'd say between an hour 45 minutes.

Q. Did part of it take place in front of employees back in the kitchen?

A. Yes, but it was not as bad a confrontation then. It was more of a running confrontation with just questions and answers. Why this and why that.

Q. Was this during the period of time when Mr. Firth and the kitchen staff were supposed to be getting ready for the dinner meal?

A. Yes.

Q. And were employees trying to do their work around them while this was going on?

A. Yes. They were.

Q. Going back to my earlier question. Between mid-afternoon and Wednesday confrontation events and the Friday afternoon events, could you describe for us Charlie's demeanor, his devotion to his work, just what was he spending his time doing? Was he running the kitchen?

A. No. He spent most of his time pursuing myself and Larry Rooker just over and over asking us the question, why was she terminated? Why was she terminated?

Q. What did ya'll tell him when he kept asking you that? What did you tell him?

A. I told him basically the reasons why she was terminated, because of her lateness.

Q. Okay. Now, have you—have you discharged men as well as women for being late or not showing up?

A. Yes, sir.

Q. Why was Christi discharged?

A. For not showing up for work the second shift.

Q. Did her discharge have anything to do with her dating Charlie Firth?

A. None whatsoever.

Q. Did it have anything to do with her being a woman?

A. None whatsoever.

Q. Did the flat two-times-and-you're-out rule apply to management as well as to hourly employees?

A. There was no—There was no law for management. That was strictly a reprimand between management and there were managers that were terminated because of their inability to do the job and that being one part of it.

Q. During this day and a half or however long it may have been, has Charles ever gone around screaming, you discharged her because she's a woman or you apply the rule because she's a woman, you discharged her because she's dating me?

A. Not to me.

Q. Did you ever hear him do it to anybody else?

A. No.

Q. You were, and I think still are, a good friend of Charlie's?

A. Yes, very good.

Q. Did you try to calm Charlie down any Wednesday or during the day Friday?

A. All day Wednesday, Thursday, and Friday. Well, Wednesday before the meeting he was more—more or less he was just in a—he didn't—he was very upset about that meeting that was coming between Larry and Christi. And he already knew what the—the fact of the matter was she could not work at the Fifth Quarter anymore. The thing that was—If any favoritism was shown, it was the fact that she was not immediately discharged and she was given an alternative to go to work at the Sailmaker.

That in itself was, you know, something in friendship for all of us that we tried to just take her out of that environment and move her to the other restaurant in our chain. We had no other place to move her. Captain D's or Shoney's which we couldn't do.

Q. Had she not been dating Charlie Firth, would such an offer have been made to her?

A. Not at all, no way.

Q. Can you think of—

A. Well, I take that back. I can't honestly say that, no. We have taken waitresses from Sailmaker and brought them to the Fifth Quarter and that was only under a manager's recommendation at the Sailmaker. We think this person is a good waitress, which Christi was.

She was a good waitress and we think you could probably use her ability in your restaurant if you're willing to take a chance on her.

But, I can say as a fact that the ones that we did that to didn't work out even at Fifth Quarter. Whatever the reasons they were moved from the Sailmaker to the Fifth

Quarter, the reason still dominated their stay at the Fifth Quarter.

Q. Was Charlie capable of performing his work that Thursday and Friday or did you in fact have to get back there and work in the kitchen for him?

A. Yes. I did a considerable amount of work and so did Doug Herrick.

Q. You said Charlie was gone a month or two months after his first here-are-the-keys-I'm-gone incident and you ran the kitchen during that period?

A. (Witness nods head.)

Q. Was the organization or the restaurant attempting to fill that slot?

A. Yes, they were. They did fill it. Well, they filled it. I don't remember if they filled it the first time he left or the second time he left. They filled it with another kitchen manager. He didn't work out. He wasn't capable of doing the job.

Q. How long was it before you filled it after his second incident?

A. Several weeks.

Q. And did you go back in to run the kitchen then?

A. Yes.

Q. You've been in the restaurant business how many years?

A. About 11 years.

Q. You've been in a management position—

A. All 11.

Q. —all 11 years?

How long does it normally take to train—to recruit and train a kitchen manager?

A. To recruit a kitchen manager with previous experience, it would take anywhere from the two weeks notice to a month.

To train a kitchen manager into your system, if he is a previous kitchen manager, can take anywhere from three months to six months. But I would say, my own personal opinion, six to eight months before they became fully understandable in your entire system, purchasing, especially with

what we deal with in a commissary system at Fifth Quarter. It would take six to eight months to become fully aware of how everything worked.

Q. How long had you in fact been training Charlie Firth?

A. In the kitchen?

Q. Yes, during all the period you've known him?

A. I didn't train him. I left the kitchen when he came to the Fifth Quarter. And he was trained by another manager, Joseph Lynch.

Q. What did Charlie do for you when he worked for you other places?

A. He was my kitchen manager at Haddacall Station. He was the assistant chef at Indian Hills Country Club and then Fifth Quarter after that.

Q. How long does it take to—How long was it taking

## ADDENDUM C

*Deposition of Lawrence Rooker*

(pages 32–33)

. . . that you don't have to reveal to her any conversations you've had . . . —

COURT REPORTER: I can't hear you.

MR. PAGE: I said, I instruct him that he is not to reveal any discussions that he's had with attorneys concerning the termination. But, you may answer as to non-attorney discussions. Excuse me. I think I interrupted you.

A. I was just trying to recall the number of people who might have had occasion to get involved in a conversation about it. Because after the termination, it became a constant subject of conversation, usually initiated by Charles.

Q. Okay. What did Charles have to say after her termination about Christi being discharged?

A. It wasn't what he had to say about what Christi's termination, it was why he was being—What was his word? Hang on.

MR. POWELL: We're all big foke.

MR. PAGE: Go ahead and say it.

A. Why are ya'll fucking me, was his constant and repetitive statement in questioning about the whole affair. He couldn't seem to get beyond that.

Q. Did he ever question why Christi Pollock was discharged?

A. Yes.

Q. And what was his question about the discharge?

A. Why was she discharged.

Q. Did he protest the fact that her discharge was not proper because he was not discharged?

A. No.

Q. Did he ever state that she was discharged for dating him and he was not discharged?

A. No.

Q. He never made that statement to you?

A. No.

Q. Do you know whether he ever made that statement to Gene Simon or any of the other management employees?

A. I do not know.

Q. Do you recall when Charles, Firth was discharged?

A. Mid '80. I don't know specifically the date or the month.

Q. Do you recall why Charles was discharged?

A. To my knowledge, Charles was not discharged. Charles quit. I have not heard the comment that Charles was discharged by anyone.

(page 38)

Q. —protesting Christi Pollock's discharge?

A. Questioning not protesting.

Q. Do you recall what he was questioning about Christi Pollock's discharge?

A. He questioned it in reference to himself. "Why are you screwing me." Not why was Christi terminated. He didn't differentiate between Christi and himself at that point.

MS. GLOVER: Okay. I'd like to have Exhibit "A" entered as an exhibit to the deposition.

MR. POWELL: I'm going on the completeness doctrine. Exhibit "A" is obviously something that was given in clarification of the prior statement made at some EEOC proceeding. And I think it would be entirely inappropriate for it to be introduced without the prior—transcript of the prior proceeding being made available so that we can understand exactly the subject matter and the purpose of this affidavit dated July 17th 19—on July 7th 1980.

I'll ask counsel now, is there any such transcript available?

MS. GLOVER: To my knowledge, there probably is no transcript. There may be some written notes.

(pages 45–46)

. . . scheduled—I think he left around mid-day maybe early afternoon and was scheduled to be back at 5:00 Friday evening.

Q. Do you recall when he did return?

A. He arrived back at the restaurant about 5:20 or 5:30.

Q. Was Mr. Simon on the premises when he got there?

A. Yes. Mr. Simon had become acquainted with the problems and was aware of Charles' emotional state and his— Charles' history of having difficulty of getting to work on time. Stayed specifically to see what—see that Charles arrived on time and if he did not, to deal with Charles at the time.

Q. Were you present or do you recall being present during any of the Simon-Firth confrontations?

A. The conversation started somewhere in the restaurant, in the back dining room, I believe. And progressed through the kitchen and eventually to the outside rear of the restaurant where Gene Simon and Charles Firth had a private discussion between themselves.

Q. Do you recall the substance of any of the discussions that took place in the restaurant?

A. It was still Charles' constant questioning about why he was being screwed in this matter. Never accepting the—our position that Christi was being terminated because she had failed to show, for the second time, for a scheduled shift. And that somehow our action in this was directed at him and not at Christi. It was—We could not make Charles understand that it had nothing to do with him. That Christi was being terminated simply because she had failed to show for a scheduled shift.

Q. Would the same action have been taken whether it had been a waitress or waiter?

A. Definitely. If their positions had been reversed and Christi had been the kitchen manager and Charles had been the waiter, it still would have been the waiter who would have been discharged if they failed to show for a scheduled shift.

Q. Just in terms of the industry and your how many years in it now?

A. 11—11 years.

Q. Okay. In terms of comparative difficulty of replacement, can you compare the problems associated with replacing a kitchen manager, without regard to sex, just the two jobs?

A. Well, the difficulty would be distinctly different.