**Renae SNELLGROVE, Bettye Brown and Ruby Johnson, Plaintiffs,**

v.

**TELEDYNE ABBEVILLE, Defendant.**

**No. CIV. A. 98–W–100–S.**

United States District Court,
M.D. Alabama,
Southern Division.

Oct. 6, 1999.

Banks Thomas Smith, Dothan, AL, for Plaintiffs.

Kelly C. Woodford, Paul D. Myrick, Mobil, AL, for Defendant. .

## MEMORANDUM OF OPINION

WALKER, United States Magistrate Judge.

Plaintiffs Renae Snellgrove, Bettye Brown and Ruby Johnson filed the present action on February 2, 1998, pursuant to Title VII of the Civil Rights Act of 1964, as amended, and 42 U.S.C. § 1981, alleging that their employer, Teledyne Abbeville ("Teledyne") discriminated against them on the basis of their race and sex. By amendment to the complaint filed April 8, 1998, plaintiffs deleted their § 1981 claims, stating that "Plaintiffs' racial charges were in error, only sex was a factor." (Motion to Amend, Doc. # 5). By amendment filed on March 29, 1999, plaintiff Ruby Johnson added a Title VII retaliation claim. Plaintiffs now assert the following claims:[1] (1) hostile environment sex discrimination; (2) discrimination in pay; (3) discriminatory discipline; (4) discriminatory failure to promote; (5) retaliatory discipline; (6) retaliatory discharge of Brown; (7) retaliatory constructive discharge of Snellgrove; and (8) retaliation against Johnson through adverse work assignments and working conditions, and discharge.

This action is presently before the court on the motions for summary judgment filed by defendant on February 18, 1999 and June 1, 1999. Defendant argues that it is entitled to summary judgment on all of plaintiffs' claims. Defendant contends that several of the claims are time-barred, that others are without factual support and that still others have been abandoned. Upon consideration of the motions for summary judgment, plaintiffs' responses, the evidentiary materials[2] and the pleadings in this case, the court concludes that

---

1. The complaint is not entirely clear, since Snellgrove and Brown adopt all earlier allegations in the complaint, including some allegations that appear to pertain only to Johnson.

2. The court considers any objections not made to the use or admissibility of the evidence to be waived for purposes of these motions. *Davis v. Howard,* 561 F.2d 565, 570 (5th Cir.1977).

defendant's motion for summary judgment on plaintiff Johnson's second amended complaint is due to be granted, and that plaintiff's initial motion for summary judgment is due to be granted in part and denied in part.

## BACKGROUND[3]

### Ruby Johnson

Plaintiff Ruby Johnson was hired by defendant in 1990 to work cleaning parts in the production department.[4] After four or five months, she became a quality control inspector. (Johnson depo., pp. 26–27). At some point after Rodger Friend became the quality control supervisor in June 1995, he commented to Johnson about "taking a dog chain and chaining [her] to the pole that was beside [her] table to keep [her] there." (*Id.*, pp. 42, 48–50). Johnson complained about this comment to Sammy Vaughn—then the plant manager—and Vaughn laughed. (*Id.*). Johnson then called defendant's employee hot line and spoke with Barrett Pulver, an ethics officer. She complained about Friend's comment, and about Vaughn's not taking her complaint seriously. Johnson also told Pulver of an incident in which, after Johnson had given Friend her opinion about a part, he said, "What do you know, you're just a woman." (*Id.*, pp. 38, 45–52). A couple of days later, Vaughn approached Johnson and asked her if anything were wrong. When she replied that she did not like the fact that he had laughed, he apologized and told her he would handle her complaint with Friend. (*Id.*, pp. 55–56).

In December 1995, defendant's employees were getting off for the holidays. Friend shook the men's hands and hugged the women goodbye "in a sideways fashion." (Johnson depo., pp. 116–17). He walked back to Johnson and said, "I've been waiting six months for this," and gave her a "full front hug," which Johnson described as "[t]he way you would hug someone you would be intimate with, grabbing and full frontward hug, close, pulled up." (*Id.*).

On January 4, 1996, Friend called plaintiff into his office and accused her of sexually harassing him in the hugging incident. Johnson went to see Jeffrie Turner, then the Human Resources Representative at Teledyne Abbeville, and told Turner what had happened. Turner advised Johnson that Friend had reported Johnson for sexual harassment. (*Id.*, pp. 120–24). As a result of Johnson's complaints about Friend, Teledyne conducted sexual harassment training for all plant employees. (Johnson depo., pp. 126–27).

In September 1996, Johnson was working at her table with another employee, Gene Barnes. Johnson asked Friend to come over to the table to answer a question regarding a gauge. Friend threw his notepad on the floor and said, "What do you want now? I'm tired of women telling me what to do." (*Id.*, pp. 64–65). Plaintiff complained to Donna Anderson, who had replaced Turner as Human Resources Representative, and to Dan Barone, the plant manager, about the comment. (*Id.*, pp. 65–66, 70–71). On another occasion near the same time, Johnson spoke with Friend about documenting changes in procedures. Friend replied, "[Y]eah, that's right, because I want to make sure I document everything because when you drop dead with your heart attack I want to make sure somebody else can get over here and do this job." (*Id.*, pp. 66–67). Johnson testified that Friend made a lot of inappropriate comments, but that the two comments referencing women and the

---

**3.** As it is required to do, the court has viewed the evidence presented on the motion for summary judgment in the light most favorable to the plaintiff. *Welch v. Celotex Corp.,* 951 F.2d 1235, 1237 (11th Cir.1992).

**4.** According to defendant, Teledyne Abbeville "disassembles used aircraft engines, reconditions the engine parts, and ships the remanufactured parts to Teledyne Continental Motors in Mobile ("TCM") to be used in the production of reconditioned aircraft engines." (Defendant's initial brief, p. 3).

"dog chain" comment were the "most offensive and unprofessional." (*Id.*).

In June 1996, Teledyne posted a job bid sign up sheet for the position of "Grade Level Four, QC Inspector. When Johnson inquired about the position, Friend told her that all QC positions were at the same level, and that it would be a lateral transfer for her." (*Id.*, pp. 139–40). Randy Pemberton, a male, was hired for the position at a higher rate of pay than plaintiff's. (*Id.*, pp. 134–36). At a luncheon with Barone, Johnson complained of the difference between her pay and Pemberton's. (*Id.*, pp. 143–47).

In November 1996, Friend reported to Anderson that Johnson had removed Bettye Brown's and Renae Snellgrove's time cards from the rack and written on them. (Anderson aff., ¶ 6). In its employee handbook, Teledyne includes "rules and regulations" which may result in discipline. Rule 4 provides that for "[f]ailure to punch your own time card, punching another employee's time card, or permitting another to punch your time card," an employee may be disciplined "up to and including discharge." (Depo. Exhibit 3A). Defendant gave Johnson a three-day suspension for failing to comply with Rule 4. The warning notice stated:

> Failure to comply with Rule 4—in marking two other employees' time cards. This is also a violation of Teledyne Ethics Code which requires each employee to maintain accurate and complete records. Further, this was done during a period of time which took you away from other ... duties which you were supposed to be performed [sic].... The rules regarding marking your own time record are clear. Additionally as an inspector, you are well aware of the necessity to have the highest level of integrity in your records. While there was no apparent attempt to defraud the company as to time, the act of removing other employees' time cards from the rack and taking them to your work area for completion cannot be tolerated.

(Exhibit 3 to Anderson aff.). Friend signed Johnson's warning notice. (*Id.*). Johnson had not, in fact, "punched" Snellgrove's and Brown's time cards, but had only calculated the number of hours they had worked that day and written it on the cards. (Johnson depo., pp. 89–90, 94–97). Brown and Snellgrove were also disciplined for the incident—they were returned to work after two days without pay. (Anderson aff., ¶ 6). Johnson had been told by a previous plant manager, Ricky Bonner, and the previous personnel manager, Jeffrie Turner, that it was acceptable to help people fill out their time cards by calculating the hours worked for them. (Johnson depo., p. 90). Barone and Anderson had never indicated to Johnson that this practice constituted grounds for discipline. (*Id.*, p. 91). On previous occasions, Friend had asked Johnson to help him out by going over the time cards and totaling employees' times. (*Id.*, p. 93). Delmar Brooks, another employee, testified that plaintiffs should not have been disciplined for the time card incident because "everybody was doing it. It was something that always happened." (Brooks depo., p. 22).

After Brown returned to work, she sent a letter to Anderson complaining that Randy Pemberton had inadvertently punched Phillip Patterson's time card when he had intended to punch a time card for Bobbie Norris. Pemberton denied that he had intended to punch Norris' card. Anderson told Pemberton "not to allow reoccurrence of such an event," but no further action was taken. (¶ 9 and Exhibit 5 to Anderson aff.).

On November 12, 1996, Johnson called the EEOC to complain regarding the time card discipline. (Johnson depo., pp. 190–91). After plaintiff filed a written EEOC charge in April 1997, she missed seven weeks of work due to surgery to remove an ovary. When she returned from her medical leave, she spent a week on a research project. Then, Johnson was placed operating a blasting machine, a job which

required heavy lifting and holding a pressurized hose. Operating the blasting machine caused plaintiff problems with the tendons in her hand. She complained to her supervisor and was sent to see the doctor. The doctor prescribed medication. When Johnson returned to work, she was placed on the same job, which aggravated the condition of her hand. (Depo. Exhibit 16; Johnson depo., pp. 171–77). Johnson complained to Anderson, and Anderson sent her back to the doctor. Johnson was then assigned to the head crusher. One of Johnson's supervisors, Ray Wilson, told Johnson that he and another supervisor, Joel Bass, had suggested to Barone that Johnson be placed in a job called "through bolts." Wilson told Johnson that Barone had laughed and refused to put Johnson in the "through bolts" position. When Bass escorted Johnson to the head crusher, he repeatedly apologized to her and said that he knew the job was strenuous, but that he had been told by Barone to put her on the machine. When Johnson complained after a few hours that she was unable to perform the head crusher job, however, Bass transferred her to the "deburr" area. (*Id.*, pp. 178–89).

Johnson's assignment to the deburr area was temporary. She was next assigned to the "red team" and to the "rework area." Johnson had no problems with either of these assignments. (Johnson April 23, 1999 deposition ("Johnson II") at p. 82). From June through August of 1998, Johnson was on maternity leave. When she returned, she was assigned to work on the bead blaster, which involves cleaning parts that weigh about two to three pounds. (Johnson II, p. 82–83; Benson aff, ¶ 8). Johnson remained primarily on the bead blaster until she left Teledyne in February 1999. (Johnson II, p. 10).

In late 1998 or early 1999, defendant installed a camera near Johnson's work area. Another camera was installed across the plant at the same time. When the camera was first installed, it rotated in a semi-circle. Around the beginning of February 1999, Johnson noticed that the camera had stopped rotating and was directed toward her work area. Johnson's supervisor, Mike Kutschat, told Johnson that the camera had been stopped to observe certain areas, and that her area was one of the areas being observed. (Johnson II, pp. 55–59).

On two occasions after the security cameras were installed, Kutschat told Johnson to work in the fuel injection disassembly area because Johnson did not have work to do in her area. On both occasions, after Johnson had worked several minutes, Kutschat told her that he had been told that she had to return to her work area. (Johnson II, pp. 60–64; 66–70). When Johnson told Kutschat that she had nothing to work on at her area, he told her to "just go over there and stand and look like you've got something to do." (*Id.*, p. 66). On a third occasion, Kutschat told Johnson to work on the mineral spirits line. After she had worked there for about five minutes, Kutschat told her to return to her work area. Kutschat stated that he did not understand the reason, but that he had been told to move Johnson back to her area. Johnson had previously seen Barone and Benson speaking with Kutschat. (*Id.*, pp. 71–74). Kutschat testified that he had been directed to move other employees back to their positions "a handful of times." (Kutschat depo, p. 24). Kutschat recalled "getting [his] butt chewed" for moving another employee, Robert Littlefield. Kutschat believed the area he had moved Littlefield to had a higher priority, and Benson disagreed. (*Id.*).

On February 26, 1999, when Johnson was clocking out of work, she received a memorandum from Donna Anderson addressed to Johnson and three other employees: Sam Thomas, Altha Jackson, and James Johnson. The memorandum stated that effective March 8, 1999, the employees' positions would be moving to the second shift (4:00 p.m. to 12:30 a.m.). (Johnson II, pp. 37–38 and Exhibit 2 to Johnson II). The following Monday, Johnson went to Anderson's office to discuss the memo. Johnson explained that she had small chil-

dren, that her husband worked the night shift, and that the shift change would be too hard on Johnson and her children. Anderson responded that the job was going to second shift. Johnson asked if there were any other positions, and Anderson told her there were none. Anderson said that if Johnson could not go to second shift, "this leaves you terminated." (Johnson II, pp. 43–46). Johnson started crying and left Anderson's office. (Id., pp. 46, 50). She found Kutschat and told him about her conversation with Anderson, and what Anderson had said about Johnson being terminated. Kutschat told Johnson he was sorry, and that he needed to follow her to get her time card. Kutschat walked Johnson to the front of the plant, where she clocked out, totaled her hours, signed the card and gave it to Kutschat. He wished her luck and she left the plant. (Id., pp. 50–51). During a telephone conversation the next day, Anderson told Johnson she was mailing Johnson a vacation form and termination slip, and that she did not realize Johnson was going to leave the job. Johnson said, "Donna, when you said I was terminated, that's what I took it as being terminated." Anderson responded, "Okay." (Id., pp. 51–52).

### Bettye Brown

Brown was hired by Teledyne Abbeville on October 14, 1985 as a production operator. She was subsequently promoted to the position of inspector, and then to the position of lead inspector of the quality department. As noted above, in June of 1995, Rodger Friend became the quality supervisor.

Sammy Vaughn, the previous plant manager at Teledyne Abbeville, testified that when Friend first assumed the quality supervisor position, he would seek advice from a man "who had limited mental capacity," rather than from Brown, his lead person. (Vaughn depo., pp. 30–32). Vaughn stated that Friend seemed to go out of his way to antagonize female employees. When asked for an example, Vaughn stated, "it's like he would take one of the females and put them on a very dirty job, when that person really wasn't qualified." (Id., pp. 32–33). Vaughn testified that he did not recall Friend saying anything derogatory specifically about plaintiffs, but that he recalled that he was "constantly on [Friend] for antagonizing the females in the department. And finally, I told him—I said, Rodger, what is your problem with the females in this department? His answer was, I don't think women should be in a shop." (Id., pp. 37–38).

On three separate occasions, Friend asked Brown why she could not be more like two production lead employees, Terry Tiraboschi and Donnie Deaton. According to Brown, Friend compared her to Deaton and Tiraboschi and asked why she could not be more like them "over and over." (Id., pp. 64–66). Brown complained to Jeffrie Turner, who was the personnel manager until April or May of 1996, about Friend's remarks that Brown should "be like them." Turner responded that it was Friend's "dry sense of humor." On other occasions, Brown stopped Turner as she came through Brown's work area and told her about "Rodger still saying little things." (Id., pp. 66–69). Regarding her allegation of discriminatory discipline, Brown testified as follows:

Q. You contend in the lawsuit that females were subjected to more disciplinary action than male employees because of their sex, correct?

A. That's correct.

Q. Is that allegation based exclusively on the discipline you received for the time card incidents and that Ms. Snellgrove and Ms. Johnson received for the same incident as opposed to whatever may have been done to Mr. Pemberton?

A. Yes, I feel that way.

Q. Are there any other instances you're talking about when you say that females were disciplined more often than males for similar offenses?

A. I knew Rodger—only the woman was punished and only three that I know

that was punished is myself and Ruby and Renae. The men could do less work and Rodger never said anything. And I was his lead person. And I knew what William Jordy Lindsey could do in his department, and he wasn't doing it and he never—Rodger never said anything to him.

Q. Did you ever bring that up to Mr. Friend?

A. Yes.

Q. What, if anything, did he tell you?

A. All Rodger would say was, I need him over there in Zyglo.

Q. Do you know what disciplinary action Rodger Friend may have taken against other employees including other male inspectors?

A. No.

Q. You say only you and your two friends are the only ones who were disciplined by Mr. Friend. You do not know that to be true, do you?

A. No.

(Brown depo, pp. 81–82).

In the fall of 1996, Brown was assigned as a lead person in production. Once, after Brown had transferred to production, Friend asked Brown about a part. When she could not answer his question, he told her, "[Y]ou was a good QC person, but you ain't worth a shit for production leading." (*Id.*, pp. 61–64). Brown told her supervisor, Benson, about the remark and asked if her job performance was meeting his expectations. Benson said that he did not have any complaints.

At some point after her assignment to production, a co-employee, Ronnie Marchman, placed his hands on Brown's breast. That day, Brown reported the incident to Bruce Benson, her supervisor. Three months later, Donna Anderson, defendant's personnel manager, spoke with Brown about Randy Pemberton's accusation that Brown had "put [her] hands all over him." Brown then told Anderson about the incident involving Marchman. Brown also reported to Anderson that Tim McCoy, another employee, had touched her on the buttocks just prior to Brown's

meeting with Anderson. (Brown depo., pp. 11, 26–27, 33, 37–44, 55). On one occasion, Benson instructed Brown to give an employee, Obie Jackson, some direction to "do something different with the exhaust pipe system that he was working on." Jackson cursed plaintiff and told her that he was not going to do what she said. Brown reported the incident to Benson, who told her that he would back her up as long as she did her job. (*Id.*, p. 55).

Defendant terminated Brown's employment on March 20, 1997 as the result of Anderson's investigation into a complaint by Randy Pemberton that Brown had sexually harassed him throughout his employment. (Anderson aff., ¶¶ 12–13; Brown depo., p. 12).

### Renae Snellgrove

Snellgrove was hired by Teledyne as a quality inspector in 1986 and worked until 1989, when she left Teledyne due to a family illness. She was rehired in September 1989 in production, then transferred to a quality inspector position. Snellgrove was a quality inspector until February 1997, when she transferred back to production. (Snellgrove depo., p.11, 27–29). After Friend became the quality supervisor, he frequently—one or more times a week—questioned what Snellgrove was doing in her job, and whether she could do more than she was doing. (*Id.*, p. 62, 74). Snellgrove believed that Friend did not like her from the outset because she knew how to do her job and did not make him feel important by going to him and asking questions. (*Id.*, pp. 57–59).

When Teledyne started cross-training employees in January 1996, Friend moved Snellgrove before any other employees. When Snellgrove was moved to the connecting rod area, Ronnie Marchman was supposed to train her. On her first day in that position, after an hour or two, Friend moved Marchman to another job and left Snellgrove alone. (*Id.*, pp. 62–63, 79–80).

After Snellgrove had been in the connecting rod area for a few days, her right

hand was badly swollen so that she could not use a torque wrench as required in the position. When Friend arrived that morning, Snellgrove showed him her hand and told him she was in pain and could not do the job. Friend told her that an insurance representative was at the plant that day, and that Snellgrove would have to continue to do the job until the insurance representative left. Snellgrove continued to work, but did not do the part of the job that hurt her hand. After thirty to forty-five minutes, Jeffrie Turner came through the area. Snellgrove showed her hand to Turner and told Turner that Friend had directed her to continue doing her job until the insurance representative left. Turner told Snellgrove that she did not have to do the job. Turner spoke with Friend, and Snellgrove was immediately moved from the position. (*Id.,* pp. 82–84).

While Snellgrove was assigned out of the connecting rod area to cover another employee's position, Alma Carter was sent to do the connecting rod job. During this period, some parts were improperly identified and sent to Mobile. When Friend was questioned about the misidentification, he said that he was training someone new in the position, and that he would talk with Snellgrove about it. He told her that she needed to be careful about sending misidentified parts to Mobile. Snellgrove told Friend that she did not believe she had sent any misidentified parts, and asked to have the parts returned so that she could see for herself. When the parts arrived from Mobile, Snellgrove determined from the inspector number on the parts that Alma Carter had misidentified the parts. When Snellgrove told Friend that Carter had made the mistakes, Friend said nothing. (*Id.,* pp. 63–67).

Friend wrote Snellgrove up several times for "any little thing that he could think of." (*Id.,* p. 63). Snellgrove's personnel record reflects that Friend gave Snellgrove a verbal warning on August 5, 1995 for being late twice, leaving early twice and two absences. In March of 1996, Friend gave Snellgrove an "AVO" ("Avoid Verbal Orders") form noting that her absences on February 15, February 22 and March 22, 1996 violated Company Rule # 18.[5] Friend gave Snellgrove an AVO form on March 26, 1996 for being "observed in the breakroom at unauthorized times" on March 21, 1996. On March 11, 1996, the same day Snellgrove was disciplined for the time card incident, Friend gave her an "employee warning notice" for careless workmanship. Friend concluded this warning notice with the statement, "This is a final warning—further violations will result in discharge." (Exhibit 6B to Anderson aff.; Snellgrove depo., pp. 77–79, 97–100). Snellgrove has no complaints about the August 1995 write-up and the March 1996 write-up regarding absenteeism. However, she believed that Friend's write-up regarding her being in the break room at unauthorized times was "nitpicking" and, to her knowledge, other male employees who did the same thing were not counseled.[6] Snellgrove also disagreed with Friend with regard to the warning for careless workmanship—Friend had previously told Snellgrove that she did not have to use "MAD" sheets and Friend had removed them from the floor. Yet, in the written warning, Friend counseled Snellgrove for her failure to use and inability to locate the MAD sheets. He also referred to her lack of productivity and, on the day in question, Snellgrove had spent two and a

---

5. According to Anderson, an AVO form is used for "a counseling memorandum, rather than discipline." (Anderson aff., ¶ 12).

6. Plaintiff testified, "[T]here were other people that went into the break room two or three minutes before nine, *being a man* and he, to my knowledge, never did or said anything to them." (Snellgrove depo., p. 102)(emphasis added). It is not clear whether the phrase "being a man" refers to Friend or the other employees in the break room. Construing this testimony in the light most favorable to plaintiff, the court concludes that plaintiff's testimony is that male employees also used the break room at unauthorized times.

half hours helping Benson, Deaton and Brown to locate parts that were needed in Mobile immediately. With regard to the time card discipline, Snellgrove did not believe she had violated the rule regarding allowing someone else to punch her time card. (*Id.*, pp. 100–13; Exhibit 6B to Anderson aff.). Friend once called Snellgrove and Brown into his office regarding use of the telephone during work time. He stated that Snellgrove and Brown were not to use the telephone. (Snellgrove depo., pp. 103–04).

Snellgrove complained several times to Turner regarding Friend's behavior. On one occasion, Snellgrove, Brown and Johnson met with Sammy Vaughn, then the plant manager. Snellgrove complained to Vaughn about Friend's constantly questioning her job performance and abilities. (*Id.*, pp. 85–88). Johnson complained that she was tired of Friend's "little snide comments about women." Vaughn said that he would speak to Friend. (*Id.*, pp. 88–89).

In February 1997, Snellgrove transferred to production, and Friend was no longer her supervisor. Snellgrove testified that, after her transfer, she had no problems with Bruce Benson, her supervisor, or Dan Barone. (*Id.*, pp. 22–24). She found the work environment at the plant to be "very hostile," however:

> Q. If you didn't have any problem with any supervisor or manager after you went to production, what do you mean when you way it became very hostile the whole plant-wide?
>
> A. I didn't have a problem with any one person in particular, but there were people that would walk around and—you never knew who it was. These people would listen to your conversations, they go back and they would tell management. You could make a simple little comment and get written up for a comment that somebody overheard you make.
>
> Q. Who was it that was walking around trying to overhear your conversations? Co-workers?
>
> A. I can't really name one person in specific—a specific person, but I do know that this was going on.
>
> Q. Can you name a single person who was trying to overhear your comments and reporting them to management?
>
> A. No.
>
> Q. Were you ever present when anyone reported something to management that you believed to have been a comment you made?
>
> A. No.
>
> Q. Anything else that made it a very hostile place even after February 20, 1997, when you were in production?
>
> A. Not that I can think of at this time.
>
> Q. Can you think of any reason why your co-workers—not managers or supervisors—would want to listen in on your conversations and report them to management?
>
> A. I cannot think of a reason why people were doing this, but it was happening. No, I can't think of a reason why someone would want to do that.
>
> Q. Just to make sure—were there any other activities going on that contributed to this being a very hostile place after you went to production?
>
> A. After I transferred from quality to production, I was close to it being time to come back—we had lunch from 11:00 to 11:45. It was maybe 11:42 when I clocked in that day, and I can't remember what day it was. But I know Mr. Friend was walking by the time clock and he said, Um, you're about to be late, aren't you? Just real snide. He had a snide way of talking.
>
> Q. Is that the only comment that Mr. Friend made to you after you moved to production?
>
> A. That I can think of—that I can think of at this time, yes.
>
> Q. Any other acts that you can tell us about that made this a very hostile place after February the 20th, 1997?
>
> A. No.

(Snellgrove depo., pp. 24–26).

Snellgrove quit her job at Teledyne on April 9, 1997. (*Id.*, p. 23).

## THE SUMMARY JUDGMENT STANDARD

A party seeking summary judgment bears the initial burden of demonstrating to the court the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions that it believes show an absence of any genuine issue of material fact. *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913 (11th Cir.1993). In *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the Court held that if a party opposing summary judgment "fails to make a showing sufficient to establish the existence of an element essential to their party's case, and on which their party will bear the burden of proof at trial," summary judgment shall be granted.

> [W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue ... Rule 56(e) ... requires the nonmoving party to go beyond the pleadings and by ... affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial... We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment.... Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56 except the mere pleadings themselves...."

*Id.* at 324, 106 S.Ct. 2548.

For summary judgment purposes, an issue of fact is "material" if it is a legal element of the claim, as identified by the substantive law governing the case, such that its presence or absence might affect

7. Defendant argues that this is so and, in their responsive brief, plaintiffs do not object to

the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. *Matsushita Electrical Industrial Company v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court must view the evidence, and all factual inferences properly drawn from the evidence, in the light most favorable to the nonmoving party. *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir.1992); *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 (11th Cir.1987). It is improper for this court to weigh conflicting evidence or make credibility determinations; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. Where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the court should refuse to grant summary judgment." *Barfield v. Brierton*, 883 F.2d 923, 933–34 (11th Cir. 1989) (citation omitted).

## DISCUSSION

### Discriminatory Discipline

Plaintiffs' discriminatory discipline claim apparently arises solely from the suspensions imposed by defendant for the time card incident.[7] Defendant contends that plaintiffs cannot prevail on this claim because they cannot identify a similarly situated male employee who was treated more favorably. Plaintiffs do not respond to this argument.

The *McDonnell Douglas/Burdine* framework was established by the Supreme Court for evaluating a Title VII plaintiff's claims of discrimination where there is no direct evidence of discrimination. *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1527–28 (11th Cir.1997).[8]

defendant's characterization of their claim. (*See* Defendant's initial brief, p. 48 n. 15).

8. Friend, after observing the time card mat-

The plaintiff must first make out a *prima facie* case of discrimination. *Burdine,* 450 U.S. at 252–53, 101 S.Ct. 1089; *Walker v. Mortham,* 158 F.3d 1177, 1183 (11th Cir. 1998); *Combs,* 106 F.3d at 1527–28.

█ Plaintiffs apparently contend that Johnson's actions in totaling the time on the time cards and the other plaintiffs' actions in allowing her to do so did not actually violate the work rule. *See* Johnson depo., pp. 89–90; (Snellgrove depo., pp. 112–13). However, to establish a *prima facie* case of disparate treatment based on discriminatory application of work rules, plaintiffs must identify a similarly situated comparator outside their protected class. In *Jones v. Bessemer Carraway Medical Center,* 137 F.3d 1306, 1311 n. 6 (11th Cir.), *superseded in part on other grounds on denial of rehearing,* 151 F.3d 1321 (11th Cir.1998), the plaintiff apparently argued that she could establish a *prima facie* case by showing that she belonged to a protected class and that she did not violate her employer's work rule. The court discussed its holding in *Jones v. Gerwens,* 874 F.2d 1534 (11th Cir.1989) and noted that the plaintiff may establish a *prima facie* case of discrimination by showing: "(1) the plaintiff is a member of a protected class; (2) the plaintiff has engaged—either (a) disputedly or (b) admittedly—in misconduct similar to persons outside the protected class; and (3) that similarly situated, nonminority employees (that is, persons outside the protected class) received more favorable treatment." *Jones,* 137 F.3d at 1311 n. 6. Under this formulation, according to the Eleventh Circuit, "... no plaintiff can make out a *prima facie* case by showing just that she belongs to a protected class and that she did not violate her employer's work rule. The plaintiff must also point to someone similarly situated (but outside the protected class) who disputed a violation of the rule and who was, in fact, treated better."

*Id.* See also *Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir.1997) (plaintiff establishes *prima facie* case by showing "(1) he belongs to a racial minority; (2) he was subjected to adverse job action; (3) his employer treated similarly situated employees outside his classification more favorably; and (4) he was qualified to do the job. ... If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present.").

█ Plaintiffs have identified Randy Pemberton as a comparator for purposes of their discriminatory discipline claim. (*See* Plaintiff's Brief in Opposition to Summary Judgment, pp. 6, 12). Upon her return after the time card discipline, Brown wrote a letter to Anderson reporting that she had observed Randy Pemberton actually punch another employee's time card. Brown stated, in part:

> Randall punched Phillip [Patterson's] card by mistake. But his intention was to punch Bobbie Norris card. Because she is always first in line to put her card in the time clock. But on this day Phillip got there first and Randall didn't know it was his card. The fact is Randall broke the rule. Because he shouldn't touch another employee card either.
>
> *     *     *     *     *     *
>
> Randall Pemberton broke both rules clocking someine els. [sic] time card alter or falisity someone's time card.
>
> (1) When he clocked him out that stopped Phillip's time. Then he clocked him back in. That alter his time changing it from being less 8 hours to back to 8 hours.
>
> (2) He falsified Phillip's time card. Randall Pemberton broke the rule.

ter, allegedly made a statement to another employee, Jordy Lindsey, that "I've been waiting a year-and-a-half for this date, I've got them now." (Snellgrove depo., p. 130; Marchman depo., pp. 26–28). Assuming the statement is admissible, it is not direct evidence that Friend reported the incident because of plaintiffs' gender. Accordingly, plaintiffs' claims will be analyzed by resort to the *McDonnell Douglas* framework.

No exception!!!

(Exhibit 5 to Anderson aff.) Anderson investigated Brown's allegations and determined that Pemberton had accidentally punched Patterson's time card. He denied intending to punch another employee's card. Anderson counseled Pemberton "not to allow reoccurrence of such an event," and took no further action. (Anderson aff. ¶ 9 and Exhibit 5). Plaintiffs have pointed to no evidence undermining Anderson's conclusion that Pemberton's violation of the work rule was accidental. Plaintiffs have failed to establish that Pemberton was similarly situated to plaintiffs with regard to violation of the work rule at issue.

■ However, plaintiffs also claim that Johnson's action in adding the time and recording it on Brown's and Snellgrove's time cards was a "common practice," and that "everyone in the company regularly wrote on co-workers' time-cards." (Plaintiffs' Brief, p. 6). Anderson has identified five male employees who admitted to having previously written on another employee's time card or having permitted another employee to write on their time card. (Anderson aff., ¶ 8 and Exhibit 4).[9] Anderson verbally reprimanded each of these employees and placed a written counseling memorandum in their personnel files, which stated, in part: "This employee understands that nobody else is to mark his time card, neither is this employee to mark anyone else's time card. Further that all Teledyne records are to be completed and signed only by the employee directly involved." (*Id.*).

■ Viewing the evidence in the light most favorable to plaintiffs, the court concludes that this evidence satisfies plaintiffs' burden of establishing a *prima facie* case. The evidence demonstrates that plaintiffs were given suspensions for the time card incident while at least five male employees who admitted engaging in identical conduct[10] were treated significantly more leniently.[11] Thus, the court rejects defen-

---

9. The court has reviewed the testimony cited by defendant in note 15 of its brief. The court does not read this testimony to limit plaintiffs' claim to a comparison of their discipline with that of Pemberton only.

10. Defendant's brief misstates the evidence on this point. Citing Anderson's affidavit at ¶ 8 and Exhibit 4, defendant states, "Several others, including 5 males and 3 females, admitted that they had done so in the past *in their capacities as Leads, or that they had allowed their Leads to do so for them.*" (Defendant's initial brief, p. 26)(emphasis added). Anderson's affidavit, however, makes no reference whatsoever to these employees writing on cards *as leads,* or allowing *leads* to write on their cards. (Anderson aff., ¶ 8).

11. Defendant cites *Bogle v. Orange County Board of County Commissioners,* 162 F.3d 653 (11th Cir.1998) for the proposition that "anecdotal testimony that other employees engaged in misconduct is not sufficient where the plaintiffs have no personal knowledge of how the defendant disciplined other employees and no knowledge regarding the disciplinary histories of these employees." (Defendant's initial brief, p. 48). In *Bogle,* the court stated,

> [Plaintiff] sought to show that other Orange County employees had violated the smoking policy and engaged in similar types of

horseplay but received no discipline at all. Bogle's evidence in this respect, however, consisted of unverifiable, anecdotal testimony from his co-workers and from his own experience of isolated incidents and of Orange County's alleged disciplinary response. This evidence could not support a reasonable jury finding that Orange County had singled Bogle out for unusually harsh treatment. The witnesses who testified regarding these other incidents had no personal knowledge of how Orange County had disciplined the employees in question and no knowledge regarding the disciplinary histories of those employees.

*Id.* at 658–59. The court concluded that plaintiff's evidence was "too tenuous and speculative to reasonably support an inference of selective discipline." *Id.* at 659 n. 8. In the present case, in contrast, the record contains evidence in the form of an affidavit from defendant's Human Resources Representative regarding male employees who admitted to engaging in the same conduct for which plaintiffs were disciplined, and the discipline she chose to impose on those employees. (Anderson aff. at ¶ 8 and Exhibit 4). This evidence is not of the same character as that presented in *Bogle.* The court recognizes that Anderson pursued the same discipline (verbal reprimand/counseling form) with at least three female employees other than plaintiffs. (*Id.*). This evidence may ultimately

dant's argument that "... it is undisputed that [Anderson] uniformly applied a policy that she understood prohibited an employee from writing on a coworker's time card." (Defendant's initial brief, p. 49). There is a genuine issue of material fact regarding whether the application of the policy was indeed uniform. Accordingly, defendant is not entitled to summary judgment on plaintiffs' discriminatory discipline claim on the basis it has argued.

## Promotion Claims

Defendant argues that it is entitled to summary judgment on plaintiffs' promotion claims because: (1) plaintiffs cannot show that they applied for an available promotion; (2) Brown admits that she does not claim that she was denied any promotion because of her sex; (3) Snellgrove and Johnson have failed to show the existence of any vacant lead positions in the 180 days preceding the filing of their EEOC charges; (4) Snellgrove and Johnson never applied for or were rejected for any promotions; and (5) Johnson did not apply for the QC inspector position, the position was filled more than 180 days before she filed an EEOC charge, and Pemberton was more qualified than Johnson for the position.

In their response to the motion for summary judgment, plaintiffs do not identify any promotion opportunities other than the QC Inspector position, apparently the one for which Pemberton was hired. (*See* Plaintiff's Brief in Opposition to Motion for Summary Judgment, pp. 25–28). Thus, the court concludes that their promotion claims pertain only to their non-selection for this particular position.

The bid sheet for the QC Inspector—Grade Level 4 was posted in June 1996. (Defendant's Deposition Exhibit 15). Pemberton was hired for the position effective August 1, 1996. (Anderson aff. ¶ 4). Plaintiffs' EEOC charges were filed on April 24, 1997. (Defendant's Deposition Exhibit 16). To maintain an action under Title VII, an employee must file a charge of discrimination with the EEOC within 180 days after the alleged discrimination. *Thomas v. Kroger Company*, 24 F.3d 147 (11th Cir.1994); 42 U.S.C. § 2000e–5(e). Plaintiffs' EEOC charges were filed nearly nine months after the date the QC Inspector position was filled by Pemberton. Defendant argues that any promotion claim based upon Pemberton's selection is, therefore, time-barred. The court agrees, and concludes that defendant is entitled to summary judgment on plaintiffs' promotion claim.[12]

---

lead a jury to conclude that the discipline imposed on plaintiffs was not imposed because of their gender. However, it does not defeat plaintiffs' *prima facie* case.

12. Plaintiff has offered no response whatsoever to defendant's argument that the promotion claim based on the Pemberton QC Inspector position is untimely. *See* Plaintiff's Brief, pp. 25–28. In view of the evidence presented in this case, it is entirely possible that the 180–day period did not begin to run until plaintiffs learned that the position for which Pemberton was hired would in fact have been a promotion for them with a pay increase—as opposed to a lateral transfer as Friend had indicated. (*See* Johnson depo., pp. 139–40). However, plaintiffs have not directed the court to any evidence regarding when they learned of Pemberton's pay. It was apparently at some point after Pemberton was hired on August 1, 1996, and before plaintiff Johnson's luncheon meeting with

plant manager Dan Barone on October 31, 1996—175 days before the EEOC charges were filed—during which Johnson addressed her complaint about the pay differential to Barone. (*See* Johnson depo., pp. 143–47; Barone aff., ¶ 2 and Exhibit 1). The court has considered whether its obligation to view the facts in the light most favorable to plaintiffs mandates drawing an inference that plaintiffs learned about the pay differential in the five days preceding the Barone luncheon meeting, and concludes that such an inference is not reasonable or required. Instead, the court concludes that defendant demonstrated its entitlement to summary judgment on this claim by establishing that the EEOC charges were not filed within 180 days of the alleged discriminatory event—*i.e.*, Pemberton's hire—and that if plaintiffs claimed that the 180–day time period was triggered by some later event, they were obliged to make this argument to the court and direct the court to evidence supporting their argument.

### · Disparate Pay Claims

██ Under the *McDonnell Douglas/Burdine* framework,[13] a plaintiff may establish a *prima facie* case of wage discrimination based on sex by showing that she occupied a job "similar to that of higher paid males." *Meeks v. Computer Associates International,* 15 F.3d 1013, 1019 (11th Cir.1994). *See also Mulhall v. Advance Security, Inc.,* 19 F.3d 586, 598 (11th Cir.1994); *Miranda v. B & B Cash Grocery Store, Inc.,* 975 F.2d 1518 (11th Cir. 1992).[14]

██ Defendant argues that it is entitled to summary judgment on plaintiffs' pay claims because "while [Marchman and Pemberton] regularly performed the same inspection duties as the Inspectors, they also performed jobs the Inspectors did not and could not perform." (Defendant's initial brief, p. 45). Defendant further argues that the pay differential was justified by Pemberton's and Marchman's "substantial background experience and qualifications, as well as Marchman's previous service as a supervisor." (*Id.*).

Defendant has introduced evidence that Marchman and Pemberton were QC Inspectors—as opposed to Inspectors like plaintiffs. In June of 1995, plaintiffs were earning $9.57 per hour (Brown), $8.30 per hour (Snellgrove) and $7.96 (Johnson) as Inspectors. Marchman was then making $10.35 per hour as a QC Inspector. Pemberton was hired as a QC Inspector in August 1996 at a higher rate of pay than plaintiffs' rate.[15] It is undisputed that Marchman and Pemberton both performed many of the same inspector duties that plaintiffs performed. (Friend aff., ¶¶ 3, 10 and Exhibit 1). Defendant has also introduced evidence that Marchman and Pemberton performed tasks that the inspectors did not perform, primarily calibrating precision measurement tools and organizing sample boards. (*Id.,* ¶¶ 3, 9). However, Marchman testified as follows regarding the job duties of QC Inspectors and Inspectors:

Q. When you were hired at Teledyne originally you were hired just as an inspector?

A. Yes.

Q. Is that different from a quality control inspector?

A. I never understood that. To me, you either are or you're not.

Q. Was there ever any distinct job differences between what a quality control

---

**13.** Again, plaintiffs have not presented direct evidence of discrimination. Defendant argues that plaintiffs' pay claims are based on the difference between their pay and that of two male employees, Marchman and Pemberton. Plaintiffs do not identify any other comparators or object to defendant's characterization of their claims. Friend states that he played no part in the decision establishing the rates of pay of Marchman and Pemberton. (Friend aff., ¶¶ 1,2,7; *see also* Friend depo., pp. 61–63). Plaintiffs have pointed to no evidence that Friend established their pay rates or recommended lower pay for them or higher pay for Marchman or Pemberton. "Direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without any inference or presumption. Therefore, remarks by non-decisionmakers or remarks unrelated to the decisionmaking process itself are not direct evidence of discrimination." *Standard v. A.B.E.L. Services, Inc.,* 161 F.3d 1318, 1330 (11th Cir.1998) (citations omitted). Alternatively, the court concludes that even under the "preponderance" standard set forth by Judge Tjoflat in *Wright v. Southland Corporation,* 187 F.3d 1287 (11th Cir.1999), Friend's negative comments about women do not constitute direct evidence of discrimination with regard to plaintiffs' pay claims, absent some evidence that Friend was in some way responsible for the differential between plaintiffs' pay and that of Marchman and/or Pemberton.

**14.** In *Miranda,* the court stated, "... Title VII incorporates a more relaxed standard of similarity between male and female-occupied jobs, thus plaintiff is not required to meet the exacting standard of substantial equality of positions." 975 F.2d at 1529 n. 15.

**15.** Defendant states that Pemberton was hired at $12.00 per hour. (Defendant's initial brief, p. 22). The affidavit paragraphs cited by defendant, however, do not specify the rate of pay. Plaintiffs agree that Pemberton's pay was "substantially higher" than theirs. (Plaintiff's Brief, p. 8).

inspector did and what somebody who was classified as an inspector did?

A. I think quality control, you have to have NDE [Non–Destructive Examination] certs.

\* \* \* \* \* \*

Q. During the time you were there, do you remember who, if anybody, they trained to get those certifications or anybody that got certified while they were at Teledyne while you were there?

A. Bettye. I'm not sure if Renae or Ruby ever got any or not. I think Ruby did—I don't know. Jordy Lindsey.

\* \* \* \* \* \*

Q. Let me back up. You said the only difference that you understood between an inspector and a quality control inspector may have been the certifications that we've been talking about?

A. As far as I can think of right now.

\* \* \* \* \* \*

Q. Did the quality control inspectors do anything differently than the regular inspectors during the course of a regular workday?

A. Not that I know of. But I still am not clear on a quality control inspector and an inspector. I never really knew the difference except it was understood that you would have NDE certs....

(Marchman depo., pp. 9–13).

The court concludes that Marchman's testimony, viewed in the light most favorable to plaintiffs, creates a genuine issue of material fact regarding whether plaintiffs' duties as Inspectors were similar to those of the higher paid QC Inspectors. Defendant has not challenged any other aspect of plaintiffs' *prima facie* case. Thus, the burden shifts to defendant to articulate a legitimate, non-discriminatory reason for the pay differential. *Miranda*, 975 F.2d at 1529. Defendant's burden in this regard is "exceedingly light." *Id.* (citation omitted).

■ One of the reasons proffered by defendant for Marchman's higher rate of pay is that he had been relieved of supervisory duties in a restructuring of the Quality Department at Teledyne Abbeville, and

that he was then reclassified from Quality Engineer to QC Inspector and had received a "substantial pay cut from $12.24 per hour to $10.05 per hour, which was the highest pay rate for an Inspector at Teledyne Abbeville." (Smith aff., ¶ 6 and Exhibit 3). Harry D. Smith, Jr., the Vice President of Human Resources for Teledyne Continental Motors in Mobile, states that the Vice President of Quality in Mobile, with Smith's approval, "concluded that any additional pay cut would be unfair and unjustified." (Smith aff., ¶ 6). Plaintiffs have directed the court to no evidence that this reason for the pay differential is pretextual. Accordingly, defendant is entitled to summary judgment on plaintiffs' pay claims, insofar as they are based on the difference between plaintiffs' pay and that of Marchman.

■ While defendant's burden of articulating a legitimate, non-discriminatory reason for its decision to pay Pemberton more than plaintiffs is light, defendant must present evidence that the decision-maker actually relied on the reason advanced. *Walker v. Mortham*, 158 F.3d 1177, 1181 n. 8 (11th Cir.1998)("The defendant cannot testify in abstract terms as to what might have motivated the decision-maker; it must present specific evidence regarding the decision-maker's actual motivations with regard to each challenged employment decision. Likewise, a court may not assume, based on its own perusal of the record, that the decision-maker in a particular case was motivated by a legitimate reason when the defendant has offered none.").

Defendant has offered evidence that the decision establishing Pemberton's initial rate of pay was made by the Vice President of Quality in Mobile and Dan Barone. (Anderson aff., ¶ 4). Defendant has also offered evidence of the relative qualifications of plaintiffs and Pemberton. (*See* evidence cited in Defendant's initial brief on pp. 18–19, 22–23). Anderson discusses Pemberton's qualifications in her affidavit and states that she recommended to Bar-

one that Pemberton be hired as a QC Inspector. She also states that she assisted in preparing the QC Inspector and Inspector job descriptions. (*Id.*). Anderson further states that "[i]n late 1996 and 1997, Teledyne Abbeville was in the process of upgrading the skill levels of employees in the Quality Department by recruiting employees with prior experience and higher skill levels than the current Inspectors. The effort necessitated paying higher starting wage rates commensurate with demonstrated skill and experience. Randy Pemberton was hired as a QC Inspector as part of that effort." (*Id.*, at ¶ 20). Anderson does not indicate that she made any recommendation regarding or had any involvement in setting Pemberton's rate of pay.

Barone, in response to a question from Johnson regarding why some new employees were paid more than employees who had worked longer at Teledyne, said generally that defendant was making an effort to upgrade skills in all areas. He did not, however, discuss his reason for awarding Pemberton a higher rate of pay. (Barone aff.). Defendant has not introduced evidence from the Vice President of Quality in Mobile or, at least, has not directed the court to any such evidence. Accordingly, the court concludes that defendant has not satisfied its burden of articulating a legitimate, nondiscriminatory reason for its decision to pay Pemberton at a higher rate and, therefore, that defendant is not entitled to summary judgment on plaintiffs' pay claims.

### Hostile Environment Claims

■■■■ Actionable hostile environment sexual harassment occurs when an employee's "workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift*

*Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (citations omitted). "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Id.* "[W]hether an environment is 'hostile' or abusive' can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23, 114 S.Ct. 367. Defendant argues that it is entitled to summary judgment on plaintiffs' hostile environment claims because they cannot present evidence of a hostile environment that was sufficiently severe or pervasive to be actionable. The court agrees.

Plaintiffs' hostile environment claims essentially consist of the following:

■■■■ 1. With regard to Johnson—(1) the "dog chain" comment, (2) the "heart attack" comment, (3) the statement, "What do you know? You're just a woman," (4) the statement, "What do you want now? I'm tired of women telling me what to do," (5) the "full front hug," (6) Friend's accusing Johnson of sexual harassment; and (7) Friend's reporting the time card incident.[16] These incidents spanned the time period from June 1995, when Benson was assigned as quality supervisor, to April 1997, when Johnson was assigned to production.

■■■■ 2. With regard to Brown—(1) Friend's repeatedly asking her why she could not be more like Deaton and Tiraboschi, (2) Friend's reporting the time card incident, (3) Friend's comment, after Brown was assigned to production, that she "ain't worth a shit for production leading," (4) Marchman's placing his hands on

---

**16.** Johnson testified that Friend made "a lot" of inappropriate comments, but she did not testify as to the nature of comments other than those set forth above. (Johnson depo.,

p. 66). The court concludes that this testimony regarding "a lot" of inappropriate comments is too vague to consider with respect to Johnson's hostile environment claim.

Brown's breast, and (5) McCoy's touching Brown on the buttocks. These incidents occurred over a period of time between June 1995 and March 1997. With regard to Marchman's placing his hands on her breast, Brown testified that she did report it to Benson, but she "didn't think nothing about it." (Brown depo., pp. 40–41).

█ 3. With regard to Snellgrove— (1) Friend's frequently questioning her job performance and ability, (2) Friend's selecting Snellgrove for cross-training before any other employees, and not allowing Marchman to remain to train her in the connecting rod area, (3) Friend's directing her to remain in her position despite her swollen hand, (4) Friend accusing her of misidentifying parts sent to Mobile, (5) Friend's write-up regarding Snellgrove's use of the break room at unauthorized times, (6) Friend's writing Snellgrove up for careless workmanship, (7) Friend's reporting the time card incident, and (8) Friend's directing her not to use the telephone. These incidents occurred between June 1995 and February 1997, when Snellgrove transferred to production.

Upon consideration of all of the circumstances, the court concludes that none of the plaintiffs has established a genuine issue of material fact regarding whether the environment to which they were subjected was "permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris, supra* (citations omitted). The court does not condone the physical touching described by Brown and Johnson, nor does it intend to express approval of Friend's comments regarding women. The court concludes only that the conduct described by plaintiffs does not rise to the level of severity or pervasiveness necessary to support a hostile environment claim under Title VII.[17] Therefore, the court will grant defendant's motion for summary judgment as to the hostile environment claims.

### Retaliatory Discipline Claim

█ To establish a *prima facie* case of retaliation, each plaintiff must show that (1) she engaged in protected activity; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between the protected activity and the adverse employment action. *Berman v. Orkin Exterminating Company, Inc.*, 160 F.3d 697, 701 (11th Cir.1998).

> If a *prima facie* case is established, the inference is raised that discriminatory intent motivated the adverse employment action, and the burden shifts to the employer to 'clearly articulate in a reasonably specific manner a legitimate non-discriminatory reason' for the adverse action with credible evidence. If the employer satisfies this burden, the burden again shifts to the plaintiff to show that the proffered reason is a pretext for the true discriminatory reason.

*Id.* at 701–02.

Plaintiffs claim that the time card discipline was imposed in retaliation for each plaintiff's protected opposition to sex discrimination. Defendant argues that plaintiffs' claims fail because: (1) their complaints were ambiguous and insufficient to constitute protected opposition to sex discrimination; and (2) they cannot demonstrate that the complaints played any part in the decision to discipline them.

With regard to defendant's first point, plaintiffs respond that "[t]he Defendant conveniently fails to mention numerous occasions on which the Plaintiffs complained to Sammy Vaughn, Jeffrie Turner, Donna Anderson, Dan Barone and Rodger Friend regarding the abusive conduct of Friend and the discriminatory hiring practices of the Defendant." (Plaintiffs' Brief, p. 29). Other than this general statement, plaintiffs do not set out the specific complaints that they believe constitute pro-

---

17. In view of this conclusion, the court does not reach defendant's arguments regarding timeliness and the scope of plaintiffs' EEOC charge.

tected opposition sufficient to support their retaliation claim. Accordingly, the court has attempted to determine the basis for plaintiffs' retaliatory discipline claims by reviewing the complaint, the factual statement in plaintiffs' brief, and the evidence cited therein.[18]

### Bettye Brown

Plaintiff Bettye Brown's retaliatory discipline claim is apparently based on the following complaints to Jeffrie Turner: (1) while Turner was the personnel manager (before May 1996), Brown complained to Turner about Friend's remarks to Brown about being like Tiraboschi and Deaton;

**18.** In the first amended complaint, Brown and Snellgrove adopted all of Johnson's allegations, which included an allegation that "Plaintiff complained to both the personnel manager and plant manager regarding Roger Flinn's treatment and conduct toward this female employee and others and subsequent to the filing of that complaint, plaintiff contends she was retaliated against by Roger Flinn by being falsely written up for improper clocking incidents which did not occurr [sic]." (Complaint, ¶ 3). The court has interpreted this allegation to pertain to Brown and Snellgrove. However, the evidence of record demonstrates that Johnson's allegation in ¶ 4 of the Complaint—that she was retaliated against for complaining of unequal pay in an October 1996 meeting—can only pertain to Johnson.

**19.** In the factual statement of her brief, plaintiff identifies the following other complaints she made at various times: (1) in October 1996, she complained to Bruce Benson that Ronnie Marchman had placed his hands on her breasts (Plaintiffs' Brief, p. 2; Brown depo., p. 40); (2) on March 17, 1997, Brown complained to Anderson regarding the same incident (Plaintiff's Brief, p.2; Brown depo., pp. 41–44); (3) a couple of weeks after Brown became production lead, she complained to Benson that Obie Jackson had cursed Brown and told her, "I'm not going to do a damn thing you say" (Plaintiff's Brief, p. 2; Brown depo., p. 55); (4) shortly after Brown became production lead in October 1996, she reported to Benson that Friend had said, "[Y]ou was a good QC person, but you ain't worth a shit for production leading" (Plaintiffs' Brief, p. 3; Brown depo, pp. 39–40, 64–65); (5) at some point, Brown complained to Friend that a male employee, Lindsay, was not doing enough work (Plaintiffs' Brief, p. 3; Brown depo., pp. 81–82). The court does not consid-

and (2) she stopped Turner "at times" to tell her that Friend was "still saying little things." (Plaintiff's Brief, p. 3; Brown depo., pp. 68–69).

However, Brown expressly testified that she does not contend that her complaints to Turner resulted in any adverse employment action. (Brown depo., p. 81). Brown has directed the court to no evidence of other complaints to any other personnel manager or plant manager (i.e., Anderson, Vaughn or Barone) that predated the time card discipline. Accordingly, defendant is entitled to summary judgment on this claim.[19]

er these various statements to fall within the allegation set forth in the complaint—i.e., that Brown was retaliated against for complaining to "both the personnel manager and the plant manager regarding Roger Flinn's treatment and conduct ..." (Complaint, ¶ 3). However, the court has analyzed these statements and concludes that none of them provides an adequate basis for Brown's retaliatory discipline claim.

As noted above, plaintiff must demonstrate that there is a causal connection between her protected opposition and the time card discipline. The time card discipline was imposed in November 1996. Brown complained to Anderson regarding Marchman's placing his hands on her breasts in March 1997, well after the time card discipline. Thus, this complaint cannot form the basis for Brown's retaliatory discipline claim. Additionally, Brown has not directed the court to any evidence that Benson participated in any way in the decision to discipline Brown for the time card incident, or that he communicated her complaints set forth above to anyone else who participated in the decision to impose discipline. Thus, plaintiff has not produced evidence that her complaints to Benson about Marchman, Jackson or Friend had any causal connection with the discipline. See Raney v. Vinson Guard Service, Inc., 120 F.3d 1192, 1197 (11th Cir.1997)("In order to satisfy the 'causal link' prong of a prima facie retaliation case, a plaintiff must, at a minimum, generally establish that the defendant was actually aware of the protected expression at the time the defendant took the adverse employment action. Since corporate defendants act only through authorized agents, in a case involving a corporate defendant the plaintiff must show that the corporate agent who took the adverse action was aware of the plaintiff's protected expression and acted within the scope of his

*Ruby Johnson*

Johnson contends that the time card discipline was imposed in retaliation for: (1) her September 1996 complaint to Anderson about Friend's statement, "What do you want now? I'm tired of women telling me what to do"; and (2) her complaint to Barone on October 31, 1996 about the difference between her pay and Pemberton's. (Johnson depo., pp. 98–100 and pp. 65–66; Plaintiffs' Brief, p. 6; Complaint, ¶¶ 3, 4).

■ With regard to the latter, defendant has introduced evidence that Johnson posed a number of written questions to Barone for him to answer in a luncheon meeting with Johnson and a few other employees. One of the questions was, "Why is some of the new employee's [sic] getting paid more than those who have been here 7–8 years?" (Barone aff., ¶ 2 and Exhibit 1). Barone states that Johnson did not say or imply during the meeting that the question was related to sex discrimination. (*Id.*). Johnson has directed the court to no evidence that she, in fact, said anything during the meeting that raised the issue of sex discrimination, and the court declines to search the record for such evidence. The question set forth above is insufficient to constitute protected opposition to sex discrimination.

■ As to the former complaint to Anderson, the court likewise concludes that this complaint did not constitute protected opposition to sex discrimination. To constitute protected opposition, the plaintiff "must have a 'good faith, reasonable belief' that her employer has engaged in unlawful discrimination." *Clover v. Total System Services, Inc.*, 176 F.3d 1346, 1351 (11th Cir.1999). The *Clover* court explained,

> The objective reasonableness of an employee's belief that her employer has engaged in an unlawful employment practice must be measured against existing substantive law. *See Harper v. Blockbuster Entertainment Corp.*, 139 F.3d 1385, 1388 n. 2 (11th Cir.1998)(failure to charge the employee who opposes an employment practice with substantive knowledge of the law "would eviscerate the objective component of our reasonableness inquiry").

*Id.* In the case of opposition to sexual harassment, the conduct opposed need not actually be sexual harassment, "but it must be close enough to support an objectively reasonable belief that it is." *Id.*

The conduct plaintiff claims to have opposed in her meeting with Anderson was Friend's statement, "What do you want now? I'm tired of women telling me what

---

or her agency when taking the action.") (citations omitted).

Regarding Brown's complaint to Friend about Lindsay's not doing enough work, the court concludes that the complaint lacked sufficient detail to constitute statutorily protected expression. It does not appear that Brown suggested to Friend in any way that she was complaining of sex discrimination. Thus, her statement does not constitute protected opposition sufficient to trigger Title VII's anti-retaliation provisions. *See Galdieri–Ambrosini v. National Realty & Development Corp.*, 136 F.3d 276, 292 (2nd Cir.1998)("[Plaintiff's] complaints to Simon and Chiaro did not state that [she] viewed Simon's actions as based on her gender, and there was nothing in her protests that could reasonably have led National Realty to understand that that was the nature of her objections."); *Jurado v. Eleven–Fifty Corporation*, 813 F.2d 1406, 1411 (9th Cir.1987)(finding expression not protected because "Jurado has not shown that he ever opposed the format change *as discriminatory* before he was fired. He merely opposed the change for personal reasons ....")(emphasis added); *Webb v. R & B Holding Company, Inc.*, 992 F.Supp. 1382 (S.D.Fla.1998)("[T]he employee must, at the very least, communicate her belief that discrimination is occurring to the employer. It is not enough for the employee merely to complain about a certain policy or certain behavior of coworkers and rely on the employer to infer that discrimination has occurred.")(citing *Jurado, supra*); *EEOC v. Shoney's, Inc.*, 536 F.Supp. 875, 877 (N.D.Ala.1982)("His very generalized complaints were that he was not being treated fairly in that other managers could date waitresses who worked at the restaurant. There is nothing in his own testimony of what he said that would put Shoney's on notice that he was protesting an illegal employment practice.").

to do." (Johnson depo., pp. 65–66). While the comment is clearly inappropriate, it falls far short of establishing the existence of an unlawful employment practice. *See Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)(" '[M]ere utterance of an ... epithet which engenders offensive feelings in an employee' does not sufficiently affect the conditions of employment to implicate Title VII.") (citations omitted). The court concludes, in light of the substantive law, that the conduct Johnson was opposing— Friend's comment—falls so far short of meeting Title VII's hostile environment standard that any belief Johnson may have held that Friend's comment constituted an unlawful employment practice was not objectively reasonable. Thus, Johnson's complaint to Anderson does not constitute protected opposition to an unlawful employment practice and cannot support Johnson's retaliatory discipline claim. *Clover, supra.*

### *Renae Snellgrove*

In plaintiffs' brief, Snellgrove refers to her complaints to Turner and to Vaughn regarding Friend's conduct. (Plaintiffs' Brief, pp. 10, 12).[20] Snellgrove testified that she, Brown and Johnson went to Vaughn's office together on one occasion, and that she complained to Vaughn about "why Mr. Friend was constantly questioning my job performance and my job abilities when, to my knowledge, no other supervisor that I had since I had been at Teledyne had ever done that." (Snellgrove depo., pp. 86–87). Snellgrove did not recall anything else about the conver-

sation, except that Johnson had told Vaughn that she was "tired of Rodger's snide little comments about women." (*Id.,* p. 88). Vaughn stated that he would talk to Friend. (*Id.,* p. 89).

With regard to her complaints to Turner, Snellgrove testified that she had complained to Turner in January 1996, when Friend made Snellgrove remain at her position despite her swollen hand, and that Turner had relieved her of the position and spoken with Friend about the situation. (Snellgrove depo., pp. 82–84). Snellgrove also testified that she had complained to Turner on several occasions about "Friend's behavior and his treatment of us." (*Id.,* p. 85).

Anderson and Barone both state that they were not aware of any complaints plaintiffs may have made about Friend before Anderson and Barone assumed their respective positions at Teledyne Abbeville. (Anderson aff., ¶ 2; Barone aff., ¶ 3). Snellgrove has not directed the court to any evidence to the contrary. Accordingly, these complaints could not have directly influenced Anderson or Barone with regard to the time card discipline. In her affidavit Anderson states that, subject to Barone's approval, she made the decision to impose discipline for the time-card offenses and decided the nature of the discipline to be imposed. (Anderson aff., ¶ 6).

The court infers from the evidence set forth above that Friend was aware at least of the complaint to Turner about Snellgrove's being asked to remain at her position despite her swollen hand, and also of her complaints to Vaughn about Friend during the meeting that all three plaintiffs had with Vaughn.[21] With regard to the

---

**20.** Plaintiff argues, citing Snellgrove's deposition testimony at pages 149–151, that "[Vaughn] was having a conversation with Snellgrove, Brown and Johnson in which the three women were telling him about the latest things Friend had done or said to them." (Plaintiff's Brief, p. 12). However, at this point in her deposition, Snellgrove actually testified, "[W]e were having a conversation and I may have been telling him something that Rodger had did or something that—I don't remember. I remember him making the statement, watch that man, girls, he's

after y'all, and we were all kind of standing around. I don't remember what the conversation was about, but that one stuck in my mind." (Snellgrove depo., p. 150). This evidence may not fairly be characterized as testimony that Snellgrove was complaining to Vaughn about Friend.

**21.** The parties disagree regarding whether Friend's knowledge of the plaintiffs' complaints is relevant. The court need not resolve this issue in view of its conclusion that the complaints made by Snellgrove were insufficient to constitute "opposition" for pur-

"swollen hand" complaint, the court concludes that the complaint—or, at least, the evidence of the complaint that is before the court—was not sufficient to provide notice to Turner and/or Friend that Snellgrove was complaining of sex discrimination. (*See* cases cited, *supra*, pp. 34–35). Therefore, this complaint may not form the basis of Snellgrove's retaliation claim.

■ Snellgrove's meeting with Vaughn likewise is insufficient to support her retaliatory discipline claim. Snellgrove complained in this meeting that she could not understand why Friend was constantly questioning her job performance and abilities when no previous supervisor had done so. (Snellgrove depo., p. 88). There is no evidence that Snellgrove told Vaughn she believed Friend's criticism to be because of her gender and, in fact, Snellgrove testified that she believed it was because she did not make Friend feel important by going to him and asking questions. (*Id.*, pp. 57–58, 88). Under these circumstances, the court cannot conclude that Snellgrove's statement to Vaughn constituted protected opposition to sex discrimination.

Snellgrove has identified no "protected opposition" sufficient to support her retaliatory discipline claim and, therefore, defendant is entitled to summary judgment on this claim.

### Retaliatory Constructive Discharge— Snellgrove

■ Snellgrove claims that her "treatment by the Defendant, after the EEOC Complaint was filed, resulted in Plaintiff being constructively discharged, and because of Defendant's treatment, she was required to leave her employment in April 1997." (Amended Complaint, filed 4/8/98, ¶ 6). As defendant argues, however, plaintiff's EEOC charge was not filed until April 24, 1997, two weeks after plaintiff

quit her employment. (Defendant's deposition exhibit 16; Snellgrove depo., p. 23).

Snellgrove makes no argument in support of her constructive discharge claim that the court is able to discern.[22] Accordingly, defendant is entitled to summary judgment on this claim because the EEOC charge—the alleged cause of the hostile treatment forming the basis for Snellgrove's constructive discharge claim—was filed after Snellgrove left defendant's employ and, thus, Snellgrove has not established the requisite causal connection to support her retaliatory constructive discharge claim.

Additionally, the evidence presented by Snellgrove regarding her working conditions (*see supra*, pp. 12–16) is insufficient to support a constructive discharge claim. *See Poole v. Country Club of Columbus,* 129 F.3d 551, 553 (11th Cir.1997)("To successfully claim constructive discharge, a plaintiff must demonstrate that working conditions were 'so intolerable that a reasonable person in her position would have been compelled to resign.' ") (citations omitted).

Therefore, the court will grant defendant's motion for summary judgment on this claim.

### Retaliatory Termination—Brown

In the complaint, Brown alleges:

Plaintiff, Betty Brown further contends that she was retalitory [sic] terminated for her complaint not only as stated above, but regarding a male employee named, Randy Pemberton, when she pointed out that Pemberton, a male employee, was not disciplined or investigated for clocking incidents. Plaintiff, Betty Brown, was terminated on or about March 20, 1997, and contends that the reason for her termination was a pretext for her complaints regarding a similarly situated male employee who was not

poses of the anti-retaliation provision of Title VII.

**22.** The court's task is complicated by the fact that plaintiff's counsel has not analyzed each

of his client's claims separately and, instead, appears to "lump" them together as though their claims were not factually distinguishable. (*See* Plaintiffs' Brief, pp. 28–32).

disciplined as well as her complaints relating to the hostile work environment by supervisor, Roger Flinn.

(Complaint, ¶ 6). As discussed previously (*see supra* n. 16), the "as noted above" refers to the allegation that Brown "complained to both the personnel manager and plant manager regarding Roger Flinn's treatment and conduct toward this female employee and others ...." (Complaint, ¶ 3).

Even assuming that Brown has established a *prima facie* case of retaliatory termination arising from these complaints or any others she may have made during her tenure with defendant (*see supra,* n. 17), defendant is entitled to summary judgment because plaintiff has not directed the court to evidence creating an issue of fact regarding whether defendant's stated reason for her termination—her sexual harassment of Pemberton—is pretextual.

Anderson states that when Randy Pemberton resigned, he complained to her that Brown had sexually harassed him throughout his employment with defendant. (Anderson aff., ¶ 12). According to Anderson:

> [Pemberton] complained that [Brown] frequently approached him when he was in an enclosed area and could not walk away, and would drape her arms around him and that behavior led to rubbing against his chest. She would also stand beside him and rub her shoulders and hips against him. He reported that on one occasion that she sat in his lap and wiggled performing, what he called, a "lap dance." On one occasion she told him that she was married but she and her husband did not sleep in the same bed and she was lonely. This was accompanied by what Pemberton described as a "cutting-eye look." She would embarrass him by congregating together with Johnson and Snellgrove and looking at him and laughing—on

one occasion one of the others remarked "go get him Bettye."

(*Id.*). Anderson states that she conducted an investigation of Pemberton's allegations, and that "[a] number of witnesses confirmed several of his complaints, including observing Bettye Brown drape her arms around Mr. Pemberton, backing into his crotch with her buttocks, and sitting in his lap and wiggling." (*Id.*). Additionally, other witnesses stated that they had seen Brown grab male employees in the genital area and buttocks and engage in other sexually-oriented behavior. (*Id.*). Anderson interviewed Brown, who denied Pemberton's allegations. (*Id.*) Anderson states that she did not credit Brown's denial because of the testimony of the other witnesses. (*Id.*, at ¶ 13). After her investigation, Anderson recommended to Vice President of Human Resources Harry Smith and Barone that Brown be terminated. (*Id.*).

Smith states that Anderson reported to him that she had found substantiation for Pemberton's complaint regarding Brown, "as well as evidence of inappropriate behavior by Bettye Brown over a long period of time that had previously not been reported." According to Smith, he made the decision to terminate Brown based on the information he received from Anderson. (Smith aff., ¶ 10). This evidence satisfies defendant's burden of articulating a legitimate, nondiscriminatory reason for its decision to terminate Brown.

As noted above, Plaintiff has not directed the court to evidence creating a genuine issue of fact regarding whether the reason articulated by Smith is pretextual.[23] Therefore, defendant is entitled to summary judgment on Brown's retaliatory termination claim.

### Johnson's Additional Retaliation Claims

On March 29, 1999, Johnson amended her complaint to allege that, in retaliation

---

**23.** Plaintiff has offered no argument in response to defendant's articulation of its rea-son for firing Brown. (*See* Plaintiff's Brief, pp. 28–32).

for her filing and pursuit of an EEOC complaint, defendant retaliated against her: (1) "by running a camera directed toward her work area," (2) by "not being allowed to work other jobs, even though her supervisor had required that she do so on at least two different occasions, and then shortly thereafter, requesting that she return to her own work area because Defendant's Management Employee, Don Barrone [sic], had become angry at Plaintiff's supervisor for allowing her to work at any other area, other than the very difficult job she was placed on after requesting a transfer away from the supervisor who discriminated and harassed her in her previous place of employment," and (3) by terminating her employment "after [plaintiff was] told she was going to have to work second shift, even though she informed her employer she had a newborn, and could not work second shift." (Second Amended Complaint, Doc. # 27).

The facts giving rise to these retaliation claims are set forth, *supra*, at pages 6–9. Defendant maintains that it is entitled to summary judgment on these claims because: (1) none of the actions of which Johnson complains constitute "adverse employment actions," and (2) she has not demonstrated a causal connection between her EEOC charge and/or lawsuit and the alleged adverse actions. Defendant further argues that Johnson cannot rebut defendant's legitimate, nondiscriminatory reasons for its actions. (Defendant's Brief in Support of Summary Judgment on Ruby Johnson's Second Amended Complaint, p. 15).

■ As discussed above, Johnson must establish that her employer took an adverse employment action against her to establish a retaliation claim. *Berman v. Orkin Exterminating Company, Inc.*, 160 F.3d 697, 701 (11th Cir.1998). To support a retaliation claim, an adverse action need not rise to the level of an "ultimate employment decision" such as a termination or failure to hire. *Wideman v. Wal–Mart Stores, Inc.*, 141 F.3d 1453 (11th Cir.1998). However, "there is some threshold level of substantiality that must be met for unlawful discrimination to be cognizable under the anti-retaliation clause." *Id.* at 1456.

■ To constitute an adverse action sufficient to support a retaliation claim, the job action must have affected a term or condition of employment; the action is not adverse "merely because the employee dislikes it or disagrees with it." *Malladi v. Brown*, 987 F.Supp. 893, 915 (M.D.Ala.1997)(quoting *Perryman v. West*, 949 F.Supp. 815, 819 (M.D.Ala.1996)). With regard to defendant's refusal to allow plaintiff to continue working temporarily in other positions when she had been directed to do so by Kutschat, the court is unable to discern any adverse effect on Johnson, other than the fact that she may have disagreed with it.

Plaintiff testified as follows:

Q. Your Second Amended Complaint further alleges that you were retaliated against—and this is what you were referring to a moment ago—by not being allowed to work other jobs even though your supervisor had requested you to on at least two occasions, and then after you moved to those jobs you were told to go back to your job on the B-blaster, correct?

A. That's correct.

\*     \*     \*     \*     \*     \*

Q. And what two different jobs are you talking about that you were temporarily assigned to off of the B-blaster?

A. Okay. On two different occasions, on the same job, which would be Sharon's job, the fuel injection disassembly area over there—

Q. That was the job directly across the aisle from you?

A. Directly across. On two occasions Mike said he would like for me to work over there. We didn't have nothing to do, and me—on one occasion I was by myself. I was told to put up my tools and go back. That was the occasion I just talked about a minute ago. On the second occasion I went over to work in

the area. Altha Jackson also didn't have nothing to do and so she came over and I trained her—I showed her how to do a certain fuel pump body so she would have something to do, too. She was working in the area. I was then approached by Mike Kutschat again, no more than after being over there five or ten minutes. He said, Ruby, you cannot work over here. I said, why? I have nothing to do, Mike. He says—I said, well, do you want Pumpkin to finish that up and we both go back over there? He said, no, they did not say that Pumpkin could not work over here. They said you are to go back to your area right now.

(Johnson II, pp. 61–62). She further testified:

Q. Being asked to go back to your job on the B-blaster where work was slow, did you have any particular problem with that?

A. No. I told Mike—I said, if that's what you want me to do, that's fine. I said, I have nothing over there. He said, just go over there and stand and look like you've got something to do.

(*Id.*, p. 66).

In *Wideman v. Wal–Mart Stores, Inc.*, 141 F.3d 1453 (11th Cir.1998), the Eleventh Circuit evaluated the actions alleged by the plaintiff collectively in determining whether there was an adverse action. Similarly, in this case, the court has considered whether the job assignment actions discussed above, when aggregated with each other and with the actions discussed *infra*, should play any part in the decision as to whether Johnson has suffered an adverse employment action and concludes that they should not. These alleged actions are not substantially adverse, as were the actions considered by the Eleventh Circuit in *Wideman*.[24] Additionally, Johnson testified that she did not

have any particular problem with being reassigned to her duty section. Accordingly, Johnson may not maintain a retaliation claim based on these job assignments.

As to plaintiff's remaining allegations, the court will not address defendant's arguments regarding Johnson's *prima facie* case because it concludes that defendant has articulated a legitimate, nondiscriminatory reason for the directing the camera at plaintiff's work area and for terminating her, and that Johnson has failed to establish pretext.

### The Camera

■ With regard to the camera directed toward Johnson's work area, defendant has introduced evidence that the camera at issue (Camera 12)was supposed to rotate 180˙but that in February and March 1999 it was broken. (Anderson 5/25/99 aff., ¶¶ 9–10). According to Anderson, she did not know that the camera had stopped on Johnson's work area, and she never reviewed any videotape from any camera that showed Johnson. (*Id.*).

Barone states that the Camera 12 was installed in January 1999, and that it stopped rotating shortly after it was installed. Thereafter, several repairs were performed on the camera by Dothan Security Company. Barone states that the camera was inoperable intermittently until mid-February, and continuously thereafter until March 9, 1999. Barone further avers that no one positioned the camera in any particular direction, but that it stopped rotating when it broke, and that he did not know that the camera had stopped while directed toward Johnson's work area. (Barone aff., 5/25/99 aff., ¶¶ 18–19). Defendant has introduced copies of work orders submitted for camera installation and repair. (Exhibit 1 to Barone aff.). In his deposition, Barone testified: that he and Anderson had the cameras moved from outside to inside the plant and had three

24. In *Wideman,* the alleged actions included: (1) forcing plaintiff to work during her scheduled leave; (2) written reprimands; (3) a one-day suspension; (4) soliciting negative statements concerning the plaintiff from other employees; (5) threatening to shoot plaintiff in the head; and (6) needlessly delaying approval of required medical treatment when plaintiff suffered an allergic reaction at work. *Wideman,* 141 F.3d at 1455.

new cameras installed when the plant was selected to begin processing "magnetos," a highly pilferable item; that the cameras were never used to observe employees in their work areas; that the tapes from the cameras are not maintained, but that the cameras "recycle" the tapes every forty-eight hours; and that the only time in the last two-and-a-half years that a tape was pulled and viewed was after there was a burglar alarm went off on the back dock at 3:00 a.m. one morning. (Barone depo., pp. 21–25).

Defendant has filed the affidavit of Tim Blankenship, the repairman who installed and repaired Camera 12. Blankenship details the repair history of the camera, including repairs for the failure of the camera to rotate. (Blankenship aff.)

In response, plaintiff cites the following testimony from her deposition:

Q. What facts do you have that led you to believe that the camera was pointed at your work area for some ulterior motive other than security?

A. I was told by my supervisor Mike Kutschat.

Q. What did Mr. Kutschat tell you?

A. I just jokingly looked at him and said, oh, well, what are we doing now, the camera done tore up, or y'all done pointing it in certain directions now? Just jokingly. And he says, the camera is stopped to observe certain areas and this area is going to be one of the ones that is being observed.

(Johnson II, pp. 57–58). Plaintiff also relies on Kutschat's testimony:

Q. Were there any discussions involving you when anybody came to you and asked you about where the locations of those cameras ought to be?

A. Most of the employees had joked about them, and I was in a—I'm in a position where I am the only manager who is not located in the front of the plant. So I have more of a one-on-one rapport with the employees. So, yes, we discussed the cameras. We discussed the cameras on numerous occasions. I used them as a device on some employees to say, Hey, you realize you're on camera. You're not performing over here. You can—we can go look it up and go check out these films, and we can see how little work you're doing—and et cetera, et cetera.

And on the other had we had done joking about them. So I had had numerous conversations about the cameras that were going up in the plant.

Q. Did you ever actually go view any videos of work areas to determine what, if anything, certain employees were doing or not doing during the course of a workday?

A. No. But they didn't know that.

(Kutschat depo., pp. 34–35). Kutschat further testified that he had "absolutely nothing" to do with the location selected for camera installation. (*Id.*, p. 35–36).

This testimony by Johnson and Kutschat does not discredit defendant's evidence that the cameras were not used to observe employees, and that Camera 12 was pointing toward Johnson's work area because it was broken. Kutschat testified that he never viewed videos of the work area, and he did not testify that anyone else did so. His statement to Johnson that "the camera is stopped to observe certain areas and this area is going to be one of the ones that is being observed"—when viewed in the context of his explanatory testimony that he joked with employees about the cameras and used them as a "device" to motivate employees by reminding employees that they were on camera—does not create a genuine issue of fact regarding whether defendant's articulated reason for the camera's being directed toward Johnson is pretextual.

*The Termination*

■ Assuming that plaintiff was terminated,[25] defendant has articulated a le-

---

25. Defendant contends that she voluntarily left her employment upon learning that she was being reassigned to the second shift.

(Defendant's brief, p. 4). Plaintiff's evidence, however, creates a genuine issue of material

gitimate, nondiscriminatory reason for its action. Barone states that he made the decision to reinstitute a second shift at the plant to further Teledyne Abbeville's goal of a 24–hour turnaround on aircraft parts and that, during 1998 and early 1999, a number of production jobs were reassigned to the second shift. (Barone 5/25/99 aff., ¶ 4). He states that the second shift was established to "enhance the speed at which these commodities [aircraft parts] cycle through this process [of disassembly, inspection, cleaning, coating, assembly and QC inspection], and that parts are cleaned on the second shift." (*Id.*). Barone avers that he made the decision to move all blasting and cleaning operations for miscellaneous parts, including Johnson's position, to the second shift in February 1999. (*Id.*, ¶ 8). He further states that individual circumstances were not considered in determining which jobs to assign to the second shift, and that the employees performing the jobs were required to accept the assignment to second shift when their jobs were transferred. (*Id.*).

Anderson also states, "If a particular job was moved to the second shift, the employee performing that job was assigned to the second shift. There were no exceptions. No employee was allowed to refuse an assignment to the second shift if his or her job was assigned to that shift." (Anderson 5/25/99 aff., ¶ 3). Anderson further indicates that when Johnson came to her office to discuss the shift change, she told Johnson that her job was being assigned to the second shift and that, if she would not

work the second shift, she would be terminated. (*Id.*, ¶ 5).

Plaintiff does not direct the court to evidence disputing the validity of defendant's reason for transferring her position to second shift or its rule that employees were required to accept the reassignment or be terminated. Instead, she argues—by analogy to an age discrimination reduction-in-force case—that defendant's refusal to place her in another vacant first shift position for which she was qualified permits an inference of retaliation. (Johnson's brief, pp. 6–8)(citing *Jameson v. Arrow Co.*, 75 F.3d 1528 (11th Cir.1996)). The court concludes that defendant's failure to consider Johnson for first shift vacancies would be evidence of pretext only if plaintiff established that defendant had allowed other employees whose jobs had been moved to second shift to take vacant jobs on the first shift in lieu of the reassignment. Plaintiff has directed the court to no such evidence.[26] Accordingly, defendant is entitled to summary judgment on Johnson's retaliatory termination claim.

## CONCLUSION

For the foregoing reasons, it is

ORDERED that defendant's motion for summary judgment on plaintiff Ruby Johnson's second amended complaint, filed June 1, 1999 (Doc. # 30) is hereby GRANTED in its entirety.

It is further ORDERED that defendant's motion for summary judgment filed February 18, 1999 (Doc. # 16) is DENIED

---

fact on this point. (*See* Johnson II, pp. 43–47; Johnson's Exhibit 5).

**26.** Without citation to evidence, Johnson argues that she "also testified that in times past the employer had made accommodations for people with young children in order to try to accommodate their employment." (Johnson's Brief, p. 8). Defendant has identified the location of this testimony as page 27 of Johnson's second deposition, where she testifies, in response to a question about whether she contends she should have been offered an alternate job because of her family circumstances, "As long as—in the past if you had

been there as long as I have, you would at least be given consideration—they would consider that you had small children. And if there were another job available that you could do, they would have." (Johnson II, p. 26–27). This testimony lacks sufficient detail to create a genuine issue of fact on the question of pretext. Fed.R.Civ.P. 56(e) requires that the party opposing summary judgment "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Again, Johnson has identified no other employee who was allowed to reject a reassignment to second shift and maintain employment on the first shift.

with respect to the retaliatory discipline claims of all three plaintiffs (relating to the time card discipline), and the discriminatory pay claims of all three plaintiffs. In all other respects, the motion is GRANTED.